Todd C. Tucci (ISB # 6526)
ttucci@advocateswest.org
Natalie J. Havlina (ISB # 7498)
nhavlina@advocateswest.org
ADVOCATES FOR THE WEST
P.O. Box 1612
Boise, ID 83701
(208) 342-7024
(208) 342-8286 (fax)

Laurence ("Laird") J. Lucas (ISB # 4733)
llucas@lairdlucas.org
P.O. Box 1342
Boise, Idaho 83701
(208) 424-1466 (phone and fax)

Attorneys for Plaintiff Western Watersheds Project

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF IDAHO

| | | |
|---|---|---|
| WESTERN WATERSHEDS PROJECT, | ) | **No.  10-cv-229** |
| | ) | |
| Plaintiff, | ) | |
| | ) | **COMPLAINT** |
| vs. | ) | |
| | ) | |
| U.S. FISH AND WILDLIFE SERVICE, | ) | |
| | ) | |
| Defendant. | ) | |

## INTRODUCTION

1.      In December 2007, this Court ruled that U.S. Fish and Wildlife Service acted

unlawfully in determining that Endangered Species Act listing of the greater sage-grouse was

"not warranted," due to improper political interference in the listing process and the Service's

arbitrary treatment of the best available science showing that sage-grouse populations and

habitats are deeply imperiled.  *See WWP v. FWS*, No. 06-cv-277-BLW (D. Idaho), *Docket No.*

*118.*   The Court remanded for the Service to make a new Endangered Species Act listing determination; and approved remand stipulations in which Plaintiff Western Watersheds Project agreed that the Service could delay the listing decision to take into account the latest sage-grouse science, as reported in a *Studies in Avian Biology* "Monograph" being prepared by leading sage-grouse researchers.  *See id., Docket Nos. 130, 137 & 183.*

2.      Based on that Monograph and other best available science, the Service announced on March 5, 2010 its new finding that ESA listing of greater sage-grouse is "warranted" under the ESA, because of the many threats facing sage-grouse populations and their sagebrush habitats – particularly habitat fragmentation from energy development, livestock grazing, infrastructure, fires, weed invasions, and climate change impacts.  *See* U.S. Fish and Wildlife Service, "Endangered and Threatened Wildlife and Plants: 12-Month Findings for Petitions to List the Greater Sage-Grouse (*Centrocercus urophasianus*) As Threatened or Endangered," 75 Federal Register 13910 (3/23/2010), *also available at* http://www.fws.gov/mountain-prairie/species/birds/sagegrouse/FR03052010.pdf  (hereafter, "March 2010 Finding").   The Service likewise found that a "distinct population segment" of greater sage-grouse located in a bi-state area of California and Nevada in the Mono Lake region (the "Bi-State DPS"), is "warranted" for ESA listing.

3.      Yet despite these scientific findings acknowledging that the sage-grouse qualifies for listing as an endangered or threatened species, the Service is perpetuating its unlawful refusal to protect sage-grouse under the ESA.  In the March 2010 Finding, the Service determined not to proceed with a proposed listing rule for the greater sage-grouse, asserting that its own bureaucratic backlog and lack of resources supposedly "preclude" it from moving forward with an ESA listing rule for the sage-grouse this year.  Likewise, the Service found that listing of the

Bi-State DPS was "precluded" for the same reasons; and it reiterated its determination that listing of another distinct population segment in the Columbia Basin on Washington (the "Columbia Basin DPS") is "warranted, but precluded" as well.

4.     This "precluded" determination relegates the greater sage-grouse (and its distinct population segments) to the long list of ESA "candidate" species – a black hole from which few species ever emerge, and under which they receive no ESA protection – and represents yet another non-scientific, politicized, and arbitrary determination that prevents the sage-grouse from obtaining the ESA protection that it urgently needs.

4.     As alleged below, the Court must reject the Service's "precluded" finding for both the greater sage-grouse and the distinct population segments as being arbitrary, capricious, and contrary to law.  The Service cannot justify its refusal to proceed with an ESA listing based on its own bureaucratic listing backlog and other grounds cited in the March 2010 Finding – particularly when the Service has already invested the bulk of the resources needed for a sage-grouse listing in rendering the March 2010 Finding; and when the Service has already been found by this Court (and many others) to have repeatedly violated the ESA in not proceeding to list sage-grouse and other species as directed by Congress.  Moreover, the Service has abjectly failed to make expeditious progress in addressing the large backlog of species that warrant ESA protection; and it is relying on improper budgetary and other excuses to avoid proceeding with the greater sage-grouse listing, contrary to the ESA's statutory requirements and without rational justification.

5.     Plaintiff Western Watersheds Project thus brings this Complaint to challenge the "precluded" part of the Service's March 1010 Finding that ESA listing of greater sage-grouse and the distinct population segments is "warranted, but precluded," as being arbitrary, capricious,

and contrary to law. WWP asks the Court to quickly review and reverse that "precluded" determination, and remand with instructions for the Service to promptly publish a proposed listing rule within a set deadline, so that greater sage-grouse can finally receive the ESA protections that science, and the Service's own "warranted" determination, show are necessary to prevent this icon of the sagebrush sea from declining further toward extinction.

## JURISDICTION AND VENUE

6. Jurisdiction is proper in this Court under 28 U.S.C. § 1331 (federal question) because this action arises under the laws of the United States, including the Endangered Species Act, 16 U.S.C. §§ 1531 et seq.; the Administrative Procedure Act, 5 U.S.C. § 701 et seq.; the Declaratory Judgment Act, 28 U.S.C. § 2201 et seq.; and the Equal Access to Justice Act, 28 U.S.C. § 2412 et seq. An actual, justiciable controversy now exists between Plaintiff and Defendants, and the requested relief is therefore proper under 28 U.S.C. §§ 2201-2202 and 5 U.S.C. § 701-06.

7. Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because Plaintiff resides in this district; and a significant portion of the events or omissions giving rise to the claims herein occurred within this judicial district.

8. The federal government has waived sovereign immunity in this action pursuant to 5 U.S.C. § 701. The Service's March 5, 2010 "precluded" determination, as challenged here, is a final agency action which is subject to judicial review by the Court pursuant to the APA, 5 U.S.C. § 701 *et seq.,* and which the ESA expressly states is "subject to judicial review." 16 U.S.C. § 1533(b)(3)(C)(ii).

## PARTIES

9. Plaintiff WESTERN WATERSHEDS PROJECT ("Western Watersheds") is an Idaho non-profit conservation group, headquartered at its Greenfire Preserve located on the East Fork Salmon River, near Clayton in Custer County, Idaho. Western Watersheds has over 1200 members plus additional volunteers and supporters, located in Idaho and around the United States; as well as professional staff in Idaho, Utah, and Wyoming.

10. Through the efforts of its staff, members, and supporters, Western Watersheds advocates science-based management of public lands in Idaho and other western states, with a focus on the sagebrush-steppe ecosystem, which forms the sole habitat of the greater sage-grouse. The decline of the greater sage-grouse, in Idaho and other states, is of great concern to Western Watersheds' staff, members and supporters; and the preservation and recovery of the species, and its sagebrush-steppe habitat, are highly important to Western Watersheds and its staff, members and supporters.

11. Members, supporters, and staff of Western Watersheds work, live and/or recreate throughout the sagebrush-steppe ecosystem of Idaho and surrounding states, which are currently occupied by greater sage-grouse. Plaintiff's members, supporters, and staff derive aesthetic, recreational, scientific, inspirational, educational, and other benefits from this ecosystem on a regular and continuing basis and intend to do so frequently in the immediate future.

12. Plaintiff's members, supporters, and staff observe and study the greater sage-grouse and the sagebrush-steppe ecosystem; and derive recreational, aesthetic, scientific, inspirational, educational, and other benefits from these activities and have an interest in preserving the possibility of such activities in the future. An integral aspect of such use and enjoyment of the greater sage-

grouse is the expectation and knowledge that species is in its native habitat.  For this reason, such use and enjoyment of the sage-grouse is entirely dependent on its continued existence in the wild.

13.     Many of Plaintiff's activities – including research and advocacy – have focused on preserving the remaining habitats of greater sage-grouse in Idaho and other states, and in restoring those habitats to protect and recover greater sage-grouse populations.  As just one example of these activities, Western Watersheds has previously brought or joined many cases before this Court in order to protect greater sage-grouse and its sagebrush-steppe habitat, including the prior ESA litigation referenced above, *WWP v. FWS*, No. 06-cv-277 (D. Idaho).

14.     The above-described aesthetic, conservational, recreational, educational, and wildlife preservation interests of Plaintiff and its members, supporters, and staff have been, are being, and, unless the relief prayed for herein is granted, will continue to be adversely and irreparably injured by Defendant's violations of law and failure to list the greater sage-grouse and/or its distinct population segments as threatened or endangered under the ESA.  These are actual, concrete injuries caused by Defendant's violations of law complained of herein.  The relief sought herein would redress these injuries.  Plaintiff has no adequate remedy at law.

15.     Defendant UNITED STATES FISH AND WILDLIFE SERVICE ("Service") is an agency or instrumentality of the United States within the federal Department of Interior; and is the federal agency to which the Secretary of the Interior has delegated the responsibility of implementing the ESA and its regulations with respect to the listing of terrestrial species, including the Greater Sage Grouse.

## FACTUAL ALLEGATIONS

**Background: Sage-Grouse Listing History.**

16.     In December 2003, Western Watersheds Project and others petitioned the Service to list greater sage-grouse as threatened or endangered.

17.     In April 2004, the Service issued a 90-day finding that ESA listing of greater sage-grouse "may be warranted."  69 Fed. Reg. 21484 (4/21/04).  This finding cited habitat and population losses that sage-grouse had already suffered, as well as numerous threats including habitat losses and fragmentation from agriculture, livestock grazing, infrastructure (powerlines, roads, fences, etc.), energy development, weed invasions, and fires.  *Id.*  The Service also noted that existing regulatory mechanisms "may be inadequate" to protect sage-grouse from these threats.  *Id.*

18.     In June 2004, the Western Association of Fish and Wildlife Agencies (WAFWA) published a "Conservation Assessment of Greater Sage-Grouse and Sagebrush Habitats," prepared by Dr. Jack Connelly of the Idaho Department of Fish and Game and other leading sage-grouse experts.  *AR 4_213 (GSG 7002-7611).*  This peer-reviewed Conservation Assessment addressed in detail the historical losses of sage-grouse habitats; the status of remaining sage-grouse populations; and many threats facing sage-grouse, including loss and fragmentation of sagebrush habitats from agriculture, grazing, energy development, infrastructure, weed invasions, fire, and others.  *Id.* The Conservation Assessment concluded that "long term population changes coupled with the continued loss and degradation of habitat and other factors (including West Nile virus) **do not provide causes for optimism**" for the future survival of sage-grouse.  *Id.*, p. 6-1 (emphasis added).

19.    In November 2004, the Bureau of Land Management adopted a "National Sage-Grouse Habitat Conservation Strategy," which it submitted to the Service for consideration in the ESA listing determination. BLM advised the Service that this National Sage-Grouse Habitat Conservation Strategy would be implemented and would be effective in conserving sage-grouse habitats and populations on BLM lands, which comprise the majority of remaining sage-grouse habitat; and hence ESA listing would be unnecessary.

20.    In January 2005, the Service issued a 12-month finding that listing greater sage-grouse under the ESA is "not warranted."  70 Fed. Reg. 2244-82 (1/12/05).  Despite the population declines, habitat losses, and threats identified in the WAFWA Conservation Assessment and other scientific literature, the Service cited "uncertainty about the future impact of threats to sage grouse," and even "reasons to be **encouraged** by current assessments of grouse population status, trends and distribution," as reasons why it refused to propose listing the sage-grouse under the ESA.  *Id.*, at 2281 (emphasis added).

21.    After Plaintiff Western Watersheds Project brought the prior litigation (No. 06-cv-277) to challenge the January 2005 "not warranted" determination, the Service filed the Administrative Record with this Court; and that record revealed that non-scientific political appointees in the Department of Interior interfered extensively in the Service's status review and determination for the sage-grouse listing, led by Deputy Assistant Secretary Julie MacDonald. *See* No. 06-cv-277, WWP's Separate Statement of Facts (*Docket No. 80-3*) (citing Administrative Record materials).

22.    An investigation by the Department of Interior Inspector General similarly found that Deputy Assistant Secretary MacDonald exercised improper interference and influence to prevent the listing of greater sage-grouse and many other high-profile species during the

administration of President George W. Bush. *See id., Docket No. 80-18* (March 2007 "Report of Investigation: Julie MacDonald, Deputy Assistant Secretary, Fish, Wildlife and Parks," U.S. Dept. of Interior, Office of Inspector General).

23.    On December 4, 2007, this Court issued its Memorandum Decision granting summary judgment to Western Watersheds Project, and reversing the January 2005 "not warranted" finding as being arbitrary, capricious and contrary to law. *See id., Docket No. 118.* The Court cited several grounds for this ruling, including: (a) the Service's "flawed process" of using an expert panel to forecast extinction risks without involving those experts in the listing determination, and without preserving their deliberations for the record for judicial review; (b) the Service's "failure to make a rational connection between the 'best science' and . . . discussion of the destruction of habitat" as addressed in the Conservation Assessment, which the Service recognized was "authoritative and objective" yet "failed to explain" why it departed from the Assessment's findings on habitat destruction; (c) the Service's "failure to coherently consider the adequacy of existing regulatory mechanisms," particularly with respect to administration of BLM lands; and (d) the improper interference of Deputy Assistant Secretary MacDonald, which the Court cited as further evidence of why the Service's "not warranted" determination did not comport with the best available science, as set forth in the Conservation Assessment and elsewhere. *Id.*, pp. 21-35.

24.    Based on the Memorandum Decision, the Court entered judgment on December 4, 2007, and remanded to the Service "for further consideration" in light of the Court's rulings. *See id., Docket No. 119.*

**Proceedings Before This Court On The Remand Process.**

25.    On December 18, 2007, Plaintiff Western Watersheds Project filed a timely "Motion To Alter Or Amend Judgment," which asked the Court to modify its remand order so as to require the Service to make a new sage-grouse listing determination within 90 days.  *See id., Docket No. 120.*

26.    On January 11, 2008, the Service filed a response which was supported by a Declaration of Brian Arroyo, the Service's Assistant Director for Endangered Species.  *See id., Docket No. 127.*  The Service opposed the 90-day timeframe for a new listing determination sought by Western Watersheds Project; and instead requested that the Court give it another year to make a new determination, citing the complexity of the issues and the volume of new scientific information it must consider.  *Id.*

27.    As Assistant Director Arroyo emphasized in his declaration, "determining whether greater sage-grouse warrants listing as an endangered or threatened species is among the most complex listing decisions the Service has had to make."  *See id.,* Arroyo Decl., ¶ 12 (*Docket No. 127-2*).  The reasons for this included the time and effort that the Service would have to expend in addressing "the significant new information that has become available since the 2005 finding, the new threats that must be considered, the substantial number of additional conservation efforts now directed at sage-grouse across its 11 state range, . . . as well as the significant amount of coordination needed" among the Service's field offices and with other federal, state, and Tribal entities and the public, each of which he explained in some detail in his declaration.  *Id.*, ¶¶ 3-15.

28.    The Service's response also advised that a "comprehensive update" of the 2004 Conservation Assessment was being prepared by leading sage-grouse researchers; and was

expected to be published as a "Monograph" in the journal *Studies in Avian Biology* by November 2008. *See id.,* Arroyo Decl., ¶ 5. The Service advised the Court that this update "will contain data and interpretation that will be critically important to the Service's status review for the new finding," and that the Service "believes the findings of the updated Conservation Assessment should be considered during the new status review to ensure we make the most informed determination possible regarding the status of the greater sage-grouse." *Id.* The Service further advised that, since this Monograph was expected to be published in November 2008 and would require some time to review and incorporate into its listing decision, it should be given until June 2009 to issue the decision. *See id., Docket No. 127. pp. 3, 14-15.*

29. In response to these points, and in order to ensure that the new sage-grouse listing determination would be based on thorough consideration by the Service of the best scientific information available (including the "Monograph"), Western Watersheds Project entered into a "Stipulation On Remand" with the Service, which was submitted to the Court on January 30, 2008. *See id., Docket No. 130.* Through this stipulation, Western Watersheds Project agreed that the Service would be allowed until May 2009 to issue a new sage-grouse listing determination so that it could take into account the scientific information from the upcoming Monograph; and thus Plaintiff withdrew its Motion To Alter Or Amend Judgment. *Id.*

30. On February 7, 2008, the Service filed a motion to withdraw from this stipulation, supported by a second Declaration of Brian Arroyo, which asserted that the Department of Interior had not properly approved the stipulation. *See id., Docket No. 131.* After briefing and hearing, the Court denied this motion; and approved the Stipulation On Remand. *See id., Docket No. 138.*

31.     On February 28, 2008, the Service published a Federal Register notice to initiate a new status review of greater sage-grouse, 73 Fed. Reg. 10218; and later extended the period for public submission of information until June 27, 2008.  *See* 73 Fed. Reg. 23172 (4/29/2008). Western Watersheds Project and other conservation groups submitted extensive information to the Service in response to these notices.

32.     On August 29, 2008, the Service submitted a status report to the Court under the Stipulation On Remand, which advised that the Service was proceeding with the new status review; but that the Monograph was delayed past the November 2008 anticipated publication date, and hence the Service would confer with Western Watersheds about the schedule for a new finding in light of that delay, as provided in the Stipulation On Remand.  *See No. 06-cv-277, Docket No.173.*

33.     Following various communications thereafter about the status of the Monograph and the Service's timing needs to incorporate the Monograph chapters into its status review, Western Watersheds Project and the Service filed an Amended Joint Stipulation on Remand on May 29, 2009.  *See id., Docket No. 183.*  Through this amended stipulation, Western Watersheds Project agreed that the Service could have until February 26, 2010 to issue a new listing determination on greater sage-grouse, in light of the delay in publication of the Monograph and to give the Service adequate time to consider and incorporate the Monograph into the listing determination.  On June 15, 2009, the Court approved the Amended Joint Stipulation on Remand.  *Id., Docket No. 184.*

34.     On February 22, 2010, the Service requested and obtained a one-week extension of the February 26, 2010 deadline for the new listing determination in the Amended Joint

Stipulation on Remand, because of the sudden death of the Service's director Sam Hamilton. *Id., Docket No. 185.*

**March 2010 "Warranted, But Precluded" Finding.**

35.     On March 3, 2010, the Service's Acting Director signed the "warranted, but precluded" finding, though the Service did not publicly announce it until March 5, 2010, when it posted the Finding on its website, at the link noted above.  *See* March 2010 Finding, p. 103.  The Finding was published in the Federal Register on March 23, 2010.  *See* 75 Fed. Reg. 13910.

36.     On March 5, 2010, Interior Secretary Ken Salazar and other officials held a media conference call to discuss the March 2010 Finding; and on the same date, the BLM issued a new Instruction Memorandum regarding future management of energy and other activities on BLM public lands in sage-grouse habitat, which it made available on BLM's website at:

http://www.blm.gov/wo/st/en/info/newsroom/sage_grouse_conservation/sage-grouse_IM.html.

37.     In the media presentations and new Instruction Memorandum, the Interior Department and BLM repeatedly referenced the 2004 National Sage-Grouse Habitat Conservation Strategy, as if that Strategy forms a meaningful part of the Department's effort to protect greater sage-grouse and thus supports the "warranted, but precluded" finding.

38.     Such representations are misleading, at best.  The BLM and Interior have not followed the National Strategy in any meaningful way since it was written in 2004 as part of the attempt to avoid ESA listing of sage-grouse.  Western Watersheds has cited BLM's failure and refusal to implement the National Sage-Grouse Habitat Conservation Strategy in other pending litigation before this Court, including *Western Watersheds Project v. Salazar*, 08-cv-516-BLW (D. Idaho) (challenging numerous Resource Management Plans adopted by BLM since 2004 across the greater sage-grouse range without adhering to, or even mentioning, the 2004 National

Sage-Grouse Habitat Conservation Strategy); and *Western Watersheds Project v. Salazar,* No. 08-cv-435-BLW (D. Idaho) (challenging hundreds of BLM grazing and energy leasing decisions across Great Basin core population of greater sage-grouse, also adopted without adhering to the 2004 National Sage-Grouse Habitat Conservation Strategy).

39.     The fact that the Interior Department has resurrected the 2004 National Sage-Grouse Habitat Conservation Strategy now as part of the decision to avoid listing greater sage-grouse again under the ESA – when that Strategy has just been gathering dust on a shelf for the last five years, even while the Interior Department and its subordinate agencies have allowed extensive energy development and infrastructure to further degrade and fragment sage-grouse habitats – underscores that the March 2010 "precluded" determination to avoid listing sage-grouse reflects a politically-influenced decision that is arbitrary, capricious, and contrary to law.

40.     The text of the March 2010 Finding bears out this conclusion.  Most of its 103 text pages is devoted to accurate analysis of the best available science showing that greater sage-grouse (and the Columbia Basin and Bi-State distinct population segments) "warrant" ESA protection under the five listing factors set forth in ESA Section 4.  *See* March 2010 Finding, pp. 3-95.  By contrast, the "precluded" portion of the March 2010 Finding relies on factual mischaracterizations and omissions, unfounded assertions, and legal misreadings of the ESA to avoid proceeding with a listing rule.  *Id.*, pp. 95-103.

41.     Specifically, the "warranted" portion of the March 2010 Finding is based on extensive scientifically-based discussion and analysis of the current status of, and threats to, greater sage-grouse populations and habitat, based on which the Service concluded – correctly – that greater sage-grouse "warrants" listing as an endangered or threatened species under the ESA, as do the Bi-State and Columbia Basin distinct population segments.

42.     This "warranted" finding and supporting analysis cited and followed not only the 2004 Conservation Assessment and the Monograph, but other scientific data and literature as well. *Id.,* pp. 3-95. The Service's analysis here underscores the many increasing threats facing sage-grouse populations and remaining habitats, including from agriculture, grazing, infrastructure, energy development (both traditional and renewable energy sources), invasive weeds and fires, but also the threats posed by climate change, West Nile virus, and other issues that the Service did not previously address in detail. *Id.*

43.     The "warranted" finding also addressed in detail the inadequacy of existing regulatory mechanisms to protect greater sage-grouse populations and habitats from these many threats; including the inadequacy of BLM's land use planning and other management decisions, which have not incorporated long-term measures necessary to ensure conservation of sage-grouse. *See id.*, pp. 62-72.

44.     The analysis and citations in the March 2010 Finding thus demonstrate that the Service's "warranted" determination is based on the best available science and was not tainted by political interference – a welcome sign of progress.

45.     By contrast, the March 2010 Finding's subsequent determination that pursuing a listing of greater sage-grouse (and the distinct population segments) is "precluded" at this time lacks the same rigor, accuracy, and rational discussion seen in the "warranted" portion of the Finding. *See* March 2010 Finding, pp. 95-103. Indeed, the "precluded" determination is premised on false characterizations and factual misrepresentations or omissions, as well as legal errors, including but not limited to the following:

A.     In asserting that proceeding with a proposed listing rule for the greater sage-grouse (as well as the Bi-State and Columbia Basin DPSs) is "precluded" by other listing

activities, the March 2010 Finding improperly relies on the Service's negative 90-day and 12-month findings as well as "warranted-but-precluded" determinations for other species, which are not proper considerations for making a "warranted, but precluded" finding based on the pendency of other proposed listings under the ESA, *see* 16 U.S.C. § 1533(b)(3)(B)(iii)(I);

B.      The Service's assertion that it lacks financial resources to proceed with a proposed listing rule for the sage-grouse in FY 2010 is also not a proper statutory consideration, *see, e.g., Center for Biological Diversity v. Norton,* 304 F. Supp. 2nd 1174, 1179-80 (D. Az. 2004) ("the solution of being over-obligated and under-funded rests with Congress, and not with the Court");

C.      The March 2010 Finding never addressed the specific costs associated with a greater sage-grouse proposed listing.  In particular, the March 2010 Finding is arbitrary and capricious in failing to acknowledge that the Service has already expended the bulk of resources and funding required for a sage-grouse proposed listing rule, because it has now devoted the staff time and resources necessary to conduct the latest status review and prepare the lengthy "warranted" determination in response to the Court's remand order.   Indeed, the Service has now conducted all the tasks that it identified previously as being necessary – including by thoroughly evaluating the Monograph and the other scientific literature, evaluating the adequacy of conservation plans and regulatory measures, coordinating with other agencies and its own field office, and undertaking the other steps previously identified by the Service (including in the Arroyo Declaration) as being needed to determine whether sage-grouse warrant ESA listing. Having already devoted all these resources to the greater sage-grouse listing, it is arbitrary and capricious for the Service to claim it is now "precluded" from proceeding with proposing a listing rule, yet the March 2010 Finding ignores these facts;

D.      Similarly, while the March 2010 Finding reports that other listing rules have cost between $11,000 and $305,000 (p. 95), it does not provide any further analysis of what those costs were or what remaining costs might be associated with proposing a sage-grouse listing rule as this time, thus depriving the Court of the ability to conduct any meaningful review of the Service's assertion that the proposed listing is "precluded" based on cost considerations;

E.      In fact, the Service's listing budget has increased in the current fiscal year from the prior year, and the Service has more funds available now for listings than it did in the past, yet the Service's track record shows that it is listing far fewer species per allocated listing dollars than in the past – for example, the number of species listed by the Service per million dollars spent on listing declined from almost 30 in 1997 to less than 5 in 2004 – but these facts again are not addressed or explained in the March 2010 Finding;

F.      Although the Service relies on its 1983 listing priority guidance to contend that numerous other "warranted, but precluded" (*i.e.*, candidate) species have a listing priority number higher than that assigned to the greater sage-grouse (and the Columbia Basin and Bi-State DPSs), thus supposedly precluding the Service from proposing a sage-grouse listing rule this fiscal year (pp. 96-98), in truth the Service does not always follow that listing priority guidance, and even concedes that other factors – including court orders and settlements – have established its highest priority for listing actions; and

G.      It is further arbitrary and capricious for the Service to rely in the 1983 listing priority guidance to avoid proceeding with a proposed listing rule for the greater sage-grouse under the facts presented here, where the Service has been found by the Court to have acted unlawfully in refusing to proceeding with a greater sage-grouse listing back in January 2005, and several years have now gone by while the sage-grouse has further declined and now admittedly

warrants ESA protection – yet the Service is using its alleged backlog of other listing actions and insufficient resources to continue depriving the sage-grouse of needed ESA protection, thus perpetuating the wrongful impacts of its own past unlawful actions in the sage-grouse and other listing matters.

46.    In addition, the March 2010 Finding is arbitrary, capricious, and contrary to law in justifying the "precluded" determination for sage-grouse listing by contending that "expeditious progress" is being made to add qualified species to the ESA lists of endangered or threatened species, as required for a "warranted, but precluded" determination under 16 U.S.C. § 1533(b)(3)(B)(iii)(II).  In truth, the Service is not making "expeditious progress" in listing species under the ESA, as demonstrated by the following facts which were not disclosed or addressed in the March 2010 Finding, or were mischaracterized by the Service:

A.    Between 1974 and 2000, the Service listed approximately 45 species per year, but since then its pace of listings has dropped to just a few listing per year in the last decade;

B.    Even at the prior pace of listing dozens of species per year, on average, the Department of the Interior's Inspector General ("IG") conducted a comprehensive review of the Service's listing program in 1990, and found that the Service was not making expeditious progress in adding "candidate" species to the endangered and threatened species lists. Considering the number of candidate species awaiting listing, IG found that, "even if the Service meets its goal of listing 50 species per year . . . it may take from 38 to 48 years at current listing rates to list just those species now estimated to qualify for protection under the Act."  The IG also revealed that 34 candidate species – 17 species of plants and 17 species of animals – had gone extinct since 1980.  The IG concluded that listing fifty species per year did not qualify as expeditious progress;

C.      In December 1992, the Service promised to substantially increase its rate of listings in order to settle a lawsuit.  *See Fund for Animals v. Lujan*, Civ. No. 92-800 (GG) (D.D.C. Dec. 15, 1992).  The Service listed an average of 89 species per year between 1992 and 1995, and an additional 152 species between February 1996 and September 1997;

D.      Between January 2001 and March 2005, the Bush Administration listed only 30 species in total, averaging approximately 7 species per year.  During that timeframe, the Service added 27 more species to the backlog of candidate species awaiting listing;

E.      In May 2004, the Service published a "Candidate Notice of Review" (CNOR) reporting that the Service had listed only 4 species since the 2002 CNOR and that 279 species were "warranted-but-precluded" (*i.e.*, candidate) species;

F.      On May 11, 2005, the Service published a new CNOR reporting that 286 species were warranted-but-precluded (*i.e.*, candidate species), and revealing that only 2 species had been listed since the 2004 CNOR;

G.      On September 12, 2006, the Service published another CNOR reporting that 279 species were warranted-but-precluded (*i.e.*, candidate) species, some of which had been on the list for more than a decade;

H.      In the summer of 2008, the Service's Director acknowledged in testimony before the House of Representatives' Committee on Appropriations that the Service had failed to list a single species for the past 661 days when it had been given millions of dollars for that purpose;

I.      On December 10, 2008, the Service published a new CNOR documenting that it listed only one species between September 30, 2007 and September 30, 2008 – the polar bear, which was listed as a result of court orders and settlement.  73 Fed. Reg. 75176.  The Service proposed just one species for listing during FY 2008: *Phyllostegia hispida* (a Hawaiian

flowering plant).  The 2008 CNOR also documented actions that were funded but not completed in FY 2008, including proposed rules to list 90 species, the majority of them endemic to the Hawaiian islands.  73 Fed. Reg. at 75189;

J.      On June 29, 2009, the House Committee on Appropriations issued a report expressing "[concern] about the known backlog of candidate species that warrant listing proposals," and directed the Service to "ensure the orderly and timely listing of any species warranting the protection of the Endangered Species Act";

K.      Dr. Nicole J. Rosmarino, an expert in policy analysis employed by WildEarth Guardians, has recently analyzed the Service's list of candidate species and determined that "the Top 40 most imperiled candidate species wait, on average, at least 13 years to be listed." *See* Declaration of Nicole J. Rosmarino, November 9. 2009, Docket No. 51-3 in *WildEarth Guardians v. Salazar*, CV-09-574-FJM (D. Ariz.), at 6;

L.      On November 9, 2009, the Service published its latest CNOR revealing that the Service listed only a single species during fiscal year 2009 – *Phyllostegia hispida* – leaving a backlog of 249 candidate species.  During FY 2009, the Service proposed four listing rules covering 54 of the 90 species that had been funded for FY 2008, including 48 species endemic to the island of Kauai.  73 Fed. Reg. 62591, 62742.  Actions that were funded in FY 2009 but not completed included final listing determinations for slickspot peppergrass, coastal cutthroat trout, and 48 species endemic to the island of Kauai; and

M.      In the March 2010 Finding, the Service indicates that it has completed five listing rules so far in FY 2010, including for slickspot peppergrass and several foreign species, all of which the Service was required to complete under court order.

47.     These and other facts demonstrate that the Service is not making "expeditious progress" in listing species under the ESA and removing "warranted-but-precluded" species from the candidate list; and that it is arbitrary, capricious, and contrary to law for the Service to refuse to proceed with a sage-grouse listing based on the false assertion that it is making expeditious progress.

48.     The Service's continued refusal to provide ESA protection to the greater sage-grouse (and its distinct population segments) through listing as an endangered or threatened species means that the legal protections that would be afforded sage-grouse under the ESA do not apply, and that federal agencies as well as state or local government and private parties can continue to approve or undertake actions that harm the sage-grouse (including through habitat destruction or fragmentation), thereby causing existing populations to decline and/or become more isolated, and further imperiling the species.

49.     Plaintiff Western Watersheds Project, as an organization and on behalf of its staff, members and supporters, is immediately and irreparably injured by the Service's unlawful "precluded" finding for the greater sage-grouse and its distinct population segments, and by the habitat and population losses and harms that are occurring and will foreseeably occur as a result of the Service's unlawful action.

50.     In order to prevent irreparable harm to the greater sage-grouse, to Plaintiff and its staff, members, and supporters, and to the public interest, the Court should promptly conduct judicial review of the "precluded" determination in the Service's March 2010 Finding, and reverse and remand the same with instructions for the Service to publish a proposed listing rule for the greater sage-grouse (and the two distinct population segments identified in the Finding) within a court-ordered deadline.

**FIRST CLAIM FOR RELIEF:**
**March 2010 "Precluded" Finding Is Arbitrary,**
**Capricious, and Contrary To Law**

51.     Plaintiff incorporates by reference all preceding paragraphs.

52.     For reasons indicated above, and as will be further demonstrated to the Court, the Service's "precluded" determination in the March 2010 Finding is arbitrary, capricious, and contrary to law under the APA and the ESA, which has caused substantial prejudice to Plaintiff; and must be reversed and remanded by the Court.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Western Watersheds Project respectfully prays that the Court grant the following relief:

A.     Declare, hold, and adjudge that the Service's "precluded" determination in the March 2010 Finding is arbitrary, capricious and contrary to law;

B.     Reverse and remand the "precluded" determination with instructions for the Service to promptly publish a proposed listing rule for the greater sage-grouse (and the two distinct population segments) on a court-ordered deadline;

C.     Award Plaintiff its reasonable attorney fees and litigation expenses incurred in bringing this First Supplemental Complaint under the Equal Access to Justice Act, 28 U.S.C. § 2412(d), and all other applicable authority; and

D.     Enter such other and further relief as the Court may deem appropriate to protect the greater sage-grouse and the public interest.

Dated:  April 30, 2010.                              Respectfully submitted,

                                        /s/ Laird J. Lucas
                                    Laurence ("Laird") J. Lucas (ISB # 4733)
                                    Attorney for Plaintiff