IGNACIA S. MORENO, Assistant Attorney General
SETH M. BARSKY, Chief
DANIEL J. POLLAK, Trial Attorney
U.S. Department of Justice
Environment and Natural Resources Division
Wildlife and Marine Resources Section
Ben Franklin Station, P.O. Box 7369
Washington, D.C. 20044-7369
(202) 305-0201 (tel)
(202) 305-0275 (fax)
Email: daniel.pollak@usdoj.gov

Attorneys for the Federal Defendant

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF IDAHO

———————————————————————
                                                    )
WESTERN WATERSHEDS PROJECT,    )
CENTER FOR BIOLOGICAL                    )
DIVERSITY, and WILDEARTH               )
GUARDIANS,                                         )          Civil No. 4:10-cv-00229-BLW
                                                    )
        Plaintiff                                 )          DEFENDANT'S MEMORANDUM IN
                                                    )          SUPPORT OF CROSS-MOTION FOR
v.                                                   )          SUMMARY JUDGMENT AND IN
                                                    )          OPPOSITION TO PLAINTIFF'S MOTION
                                                    )          FOR SUMMARY JUDGMENT; AND
                                                    )          IN SUPPORT OF DEFENDANT'S AND
UNITED STATES FISH AND WILDLIFE  )          PLAINTIFF WILDEARTH GUARDIANS'
SERVICE,                                           )          JOINT MOTION TO DISMISS
                                                    )
        Defendant                              )
                                                    )
———————————————————————)

# TABLE OF CONTENTS

PAGE

INTRODUCTION ......................................................................................................... 1

**STATUTORY AND REGULATORY BACKGROUND** ........................................... 3

I.     The Listing Process and Warranted-But-Precluded Findings ............................ 3

II.    The Roles of the Courts and Congress in Driving Listing Program Priorities ................. 5

**FACTUAL AND PROCEDURAL BACKGROUND** ............................................... 8

I.     The Greater Sage-Grouse .................................................................................. 8

II.    The 2010 12-Month Finding Challenged in This Litigation ............................. 8

     A.    The Analysis of Whether Listing the Sage-Grouse Was "Warranted" .................. 8

     B.    The Preclusion Findings for the Sage-Grouse ..................................... 10

III.    The MDL Settlement Agreements ................................................................. 11

**STANDARD OF REVIEW** ..................................................................................... 12

**ARGUMENT** .......................................................................................................... 13

I.     The Court Should Exercise its Equitable Discretion to Dismiss This Case Because the Issues Have Already Been Resolved by the MDL Agreements ...................................... 13

II.    If the Court Reaches the Merits, WWP's Challenges to the 12-Month Finding Should Be Rejected ............................................................................................... 20

     A.    The Preclusion Portion of the 12-Month Finding Was Reasonable and Well-Supported by the Law and the Administrative Record. ........................................ 20

     B.    The Service Amply Demonstrated its Expeditious Progress. ............................... 25

     C.    The Sage-Grouse's LPN Was Determined by Science, Not Politics. .................. 30

III.    WWP Has Waived Any Claims Regarding the Bi-State and Columbia Basin DPS's, and Fails to Challenge Any Judicially Reviewable Decision on the Latter. .................... 39

IV.    The Court Should Decline to Grant An Infeasible Remedy or One That Conflicts With the MDL Agreements. ................................................................................. 40

**CONCLUSION** ...................................................................................................................... 40

# TABLE OF AUTHORITIES

CASES                                                                                    PAGE

Ali v. Cangemi, 419 F.3d 722 (8th Cir. 2005 ............................................................. 15

Asarco, Inc. v. EPA, 616 F.2d 1153 (9th Cir. 1980) .............................................. 17-18

Baltimore Gas & Elec. Co. v. Natural Res. Def. Council, 462 U.S. 87 (1983) ........................... 13

Bennett v. Spear, 520 U.S. 154 (1997) ...................................................................... 39

Bergh v. Washington, 535 F.2d 505 (9th Cir. 1976) ................................................... 18

Bragg v. Robertson, 83 F. Supp. 2d 713 (S.D. W.Va. 2000),
    aff'd sub nom, Bragg v. W. Va. Coal Ass'n, 248 F.3d 275 (4th Cir. 2001)...................... 19

Building and Constr. Dep't v. Rockwell Int'l Corp., 7 F.3d 1487 (10th Cir. 1993)...................... 16

California ex rel. Lockyer v. U.S. Dep't of Agric., 710 F. Supp. 2d 916 (N.D. Cal. 2008),
    aff'd, 575 F.3d 999 (9th Cir. 2009)............................................................ 19

California Native Plant Soc'y v. Norton, 2005 WL 768444 .......................................... 30

Carlton v. Babbitt, 900 F. Supp. 526 (D.D.C. 1995) ................................................. 23

Carver v. Knox County, 887 F.2d 1287 (6th Cir. 1989)...................................... 40 n.22

Center for Biological Diversity v. Kempthorne, 466 F.3d 1098 (9th Cir. 2006) ................... 29-30

Center for Biological Diversity v. Norton, 254 F.3d 833, 838 (9th Cir. 2001) ..... 20-21, 26, 28, 29

Center for Biological Diversity v. Norton, 304 F. Supp. 2d 1174 (D. Ariz. 2003) ..................... 29

Center for Biological Diversity v. Norton,
    No. CV S-03-1758 GEB/DAD, slip op. at 16 (E.D. Cal June 22, 2004)

Chevron U.S.A. v. Natural Res. Def. Council, 467 U.S. 837 (1984) ..................................... 13, 27

Citizens to Pres. Overton Park v. Volpe, 401 U.S. 402 (1971) ...................................... 12

Coos County Bd. of County Comm'rs v. Kempthorne, 531 F.3d 792 (9th Cir. 2008) ................ 21

DeMaurez v. Swope, 110 F.2d 564 (9th Cir. 1940)................................................... 18-19

Espinoza v. Farah Mfg. Co., 414 U.S. 86 (1973) ........................................................ 13

FCC v. National Citizens Comm. for Broad., 436 U.S. 775 (1978) ............................................. 13

FCC. v. Fox Television Stations, 556 U.S. 502 (2009) ................................................................. 13

Federal Power Comm'n v. Idaho Power Co., 344 U.S. 17 (1952) ................................................ 18

Feller v. Brock, 802 F.2d 722 (4th Cir. 1986) ............................................................................. 19

Florida Power & Light Co. v. Lorion, 470 U.S. 729 (1985)......................................................... 17

Forest Guardians v. Babbitt, 164 F.3d 1261 (10th Cir. 1998), amended and reprinted,
   174 F.3d 1178 (10th Cir. 1999) ........................................................................................... 6 n.5

Forest Guardians v. U.S. Forest Serv., 329 F.3d 1089 (9th Cir. 2003) ........................................ 13

Friends of the Wild Swan v. U.S. Fish & Wildlife Serv., 945 F. Supp. 1388 (D. Or. 1996) . 24, 34

Guerrero v. RJM Acquisitions LLC, 499 F.3d 926 (9th Cir. 2007) ............................................. 19

Kern County Farm Bureau v. Allen, 450 F.3d 1072 (9th Cir. 2006)............................................ 13

Marsh v. Oregon Natural Res. Council, 490 U.S. 360 (1989)................................................ 13, 35

Mountain States Legal Found. v. Espy, 833 F. Supp. 808 (D. Idaho 1993)................................. 40

Natural Res. Def. Council v. Norton, 2007 WL 14283 (E.D. Cal. Jan. 3, 2007) ................... 15, 20

Natural Res. Def. Council v. U.S. Dep't of Interior, 113 F.3d 1121 (9th Cir. 1997)............... 6 n. 3

New Mexico Cattle Grower's Ass'n v. U. S. Fish and Wildlife Serv.,
   248 F.3d 1277 (10th Cir. 2001) ............................................................................................ 6 n.5

Oregon Natural Res. Council v. Keys, 2004 WL 1048168 (D. Or. May 7, 2004) ....................... 16

Reyn's Pasta Bella v. Visa USA, 442 F.3d 741 (9th Cir. 2006) .................................................. 19

Sierra Club v. Babbitt, 69 F. Supp. 2d 1202 (E.D. Cal. 1999) .............................................. 15, 20

Smith v. Bayer Corp., 131 S. Ct. 2368 (2011).............................................................................. 18

Southern Utah Wilderness Alliance v. Smith, 110 F.3d 724 (10th Cir. 1997) ........................ 15-16

United States v. Mead Corp., 533 U.S. 218 (2001) ...................................................................... 13

Village of False Pass v. Clark, 733 F.2d 605 (9th Cir. 1984)....................................................... 12

<u>West Gulf Maritime Ass'n v. ILA Deep Sea Local 24</u>, 751 F.2d 721 (5th Cir. 1985) ................ 19

<u>STATUTES</u>

5 U.S.C. § 704 ...................................................................................................................... 39

5 U.S.C. § 706(2)(A) ........................................................................................................... 12

16 U.S.C. § 1531(b) ............................................................................................................... 3

16 U.S.C. § 1532 ................................................................................................................... 27

16 U.S.C. §§ 1532(6) ............................................................................................................. 3

16 U.S.C. § 1533(a)(1) ..................................................................................................... 3, 32

16 U.S.C. § 1533(b)(3) ........................................................................................................... 3

16 U.S.C. § 1533(b)(3)(A) ..................................................................................................... 4

16 U.S.C. § 1533(b)(3)(B) ............................................................................................. passim

16 U.S.C. § 1533(b)(3)(B)(iii) ............................................................................................ 10

16 U.S.C. § 1533(b)(3)(B)(iii)(I) .......................................................................................... 5

16 U.S.C. § 1533(b)(3)(B)(iii)(II) ....................................................................................... 25

16 U.S.C. § 1533(b)(3)(C)(i) .................................................................................................

16 U.S.C. § 1533(b)(6)(A) ..................................................................................................... 4

16 U.S.C. §§ 1533(b)(6)(C) ............................................................................................... 4, 5

16 U.S.C. § 1533(b)(6)(C)(ii) ............................................................................................... 6

16 U.S.C. § 1533(h)(3) ........................................................................................................ 31

28 U.S.C. § 1404(a) ............................................................................................................. 40

## FEDERAL REGULATIONS

50 C.F.R. § 402.12(d) ................................................................................................ 5

50 C.F.R. § 424.16(c)(2) ............................................................................................ 4

50 C.F.R. §§ 424.10 ................................................................................................... 3

48 Fed. Reg. 43,098 (Sept. 21, 1983) ............................................... 7-8, 11, 31

66 Fed. Reg. 22,984 (May 7, 2001) ........................................................................ 10

74 Fed. Reg. 57,804 (Nov. 9, 2009) ............................................................ 5, 38, 39

75 Fed. Reg. 13,910 (Mar. 23, 2010) .................................................................. passim

75 Fed. Reg. 59,804 (Sept. 28, 2010) ................................................................... 24

75 Fed. Reg. 69,222 (Nov. 10, 2010) ......................................................... 22-23, 39

76 Fed. Reg. 55,623 (Sept. 8, 2011) ..................................................................... 25

76 Fed. Reg. 62,192 (Oct. 6, 2011) ....................................................................... 22

## FEDERAL RULES OF CIVIL PROCEDURE

Fed. R. Civ. P. 56(a) ................................................................................................ 12

## LEGISLATIVE HISTORY

H.R. Conf. Rep. 97-835 reprinted at 1982 U.S.C.C.A.N. 2860 (1982) .......... 20, 21, 26, 28, 29, 31

H.R. Rep. No. 107-103, 107th Cong., 1st Sess. *30 (June 19, 2001) ....................................... 7, 29

Pub. L. 105-83, 111 Stat. 1543 (1997) ........................................................................ 6, 7

Federal Defendant U.S. Fish and Wildlife Service ("Service") hereby submits the following Memorandum in support of its Cross-Motion for Summary Judgment and in opposition to Plaintiff Western Watershed Project's ("WWP's") Motion for Summary Judgment (Dkt. 72). In addition, Section I of the Argument section of this brief, at pages 13-20, *infra*, is submitted jointly with Plaintiff WildEarth Guardians ("Guardians") in support of their Joint Motion to Dismiss. Guardians joins this Memorandum as to Section I of the Argument only, and takes no position on the remaining Argument sections.

## INTRODUCTION

In making its warranted-but-precluded finding for the greater sage-grouse ("sage-grouse"), the Service was carrying out the direction of Congress to rationally prioritize its limited budget for the Endangered Species Act ("ESA") listing program. See 75 Fed. Reg. 13,910, 14,008-14 (Mar. 23, 2010) ("12-Month Finding"). At the time of the challenged 12-Month Finding, there were hundreds of other species already awaiting proposed listing rules that were a higher priority for listing under the Service's Listing Priority Guidelines, guidelines whose validity WWP does not challenge. At the same time, issuance of a proposed listing rule was also precluded by the heavy workload of petition-driven listing deadlines that are fixed by statute and/or court order.

WWP has constructed a conspiratorial narrative in which they argue that the warranted-but-precluded finding on the sage-grouse was "a pre-determined, politically calculated decision to avoid [] listing." Pl.'s Brief in Supp. of M. for Summ. J. ("Pls.' Mem."), Dkt. 72, at 1. This view is baseless and founded on numerous distortions and misrepresentations of the record. The sage-grouse warranted-but-precluded finding was a product of budgetary constraints and the Service's rational attempt to set priorities in the fashion provided for by Congress when it

drafted the ESA to explicitly allow for such findings. <u>See</u> 12-Month Finding at 14,008-14. WWP's allegation that the Service was arbitrary and capricious in its science-based assessment of the listing priority of the sage-grouse relative to other imperiled species is also unfounded, as are its allegations attacking the Service's "preclusion" and "expeditious progress" findings.

Contrary to WWP's unsupported assertions, the Service has no desire to withhold the protections of the ESA from the sage-grouse. In fact, the Service has recently entered into judicially-enforceable settlement agreements in multi-district litigation ("MDL") with two of the three original plaintiffs in this case to expedite further action on the sage-grouse. Under these agreements, in exchange for relief from the burden of future petition-driven litigation, the Service has committed to providing the very relief that Plaintiffs sought in this action, by committing to take action to remove the sage-grouse and the Bi-State Distinct Population Segment ("DPS") of the species from the candidate list by the end of Fiscal Year ("FY") 2015 and 2013, respectively. In addition, the MDL settlements address the underlying dispute in this case about whether the Service is making "expeditious progress" in its listing program, by providing for an enforceable timetable under which the Service will address, by the end of FY 2016, *every single one* of the 251 species that were on the warranted-but-precluded candidate species list at the time of the 12-Month Finding. <u>See</u> *infra* at 13-20.

These changed circumstances have led one Plaintiff in this case to move to withdraw, and another to seek dismissal of this action. <u>See</u> *infra* at 14-15. In fact, the claims of WWP, the only remaining Plaintiff, are so attenuated as to render them prudentially moot, and the Court should exercise its equitable discretion to refrain from reaching the merits at all. Such dismissal is also called for under equitable principles of judicial comity, under which a federal court should avoid orders inconsistent with orders issued by a parallel court regarding the same matters.

# STATUTORY AND REGULATORY BACKGROUND

## I.      The Listing Process and Warranted-But-Precluded Findings

In 1973, Congress enacted the ESA "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved, [and] to provide a program for the conservation of such endangered species and threatened species." 16 U.S.C. § 1531(b). Section 4 of the ESA directs the Secretary to determine whether a given species should be listed as endangered or threatened based on five factors: (A) the present or threatened destruction, modification, or curtailment of its habitat or range; (B) overutilization for commercial, recreational, scientific, or educational purposes; (C) disease or predation; (D) the inadequacy of existing regulatory mechanisms; or (E) other natural or manmade factors affecting its continued existence. 16 U.S.C. § 1533(a)(1); see also 50 C.F.R. §§ 424.10, 424.11(c). An "endangered species" is defined as "any species which is in danger of extinction throughout all or a significant portion of its range," while a "threatened species" is "any species which is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range." 16 U.S.C. §§ 1532(6), (20). A listed species gains various protections under the ESA to prevent harm to it and aid its recovery. See Id. at §§ 1532(19), 1533(f), 1536(b)(3)(A), 1538.

The ESA allows any "interested person" to petition the Service to list a species as threatened or endangered. See 16 U.S.C. § 1533(b)(3).[1] Once the Service receives such a petition, it must determine within 90 days "[t]o the maximum extent practicable" whether the petition presents "substantial scientific or commercial information indicating that the petitioned action may be warranted." 16 U.S.C. § 1533(b)(3)(A). If the 90-day finding concludes that the

---

[1] The Service may also assess a species for listing on it is own initiative, a process known as the

petition does not present substantial information indicating that listing may be warranted, the listing process is terminated for that petition. If the Service makes a positive 90-day finding for a species, it commences a status review and then must determine within twelve months of the date it received that petition whether the petitioned action is: (1) not warranted; (2) warranted; or (3) warranted but precluded. Id. at § 1533(b)(3)(B). This is known as the "12-month finding."

If the Service's 12-month finding is that listing is "not warranted," this finding terminates the listing process. If the Service's 12-month finding is that listing is "warranted," however, it must promptly publish in the Federal Register "a general notice and the complete text of a proposed regulation to implement" the listing ("proposed listing rule"), id. at § 1533(b)(3)(B)(ii), (5)(A)(i), and provide for a public comment period of 60 days. 50 C.F.R. § 424.16(c)(2). The Service must thereafter issue a final listing determination within 12 or 18 months, depending on the circumstances. 16 U.S.C. § 1533(b)(6)(A), (B). The two alternatives for a final listing determination are: (1) adoption of a final rule implementing the listing determination; or (2) withdrawal of the proposed rule because the Service determines that the species is not endangered or threatened. Id. at § 1533(b)(6)(A)(i), (B)(ii). During the time that proposed and final listing rules are being prepared, the Service also generally works concurrently on designating critical habitat for the species. See 16 U.S.C. §§ 1533(b)(6)(C), 1536.

The third alternative for a 12-month finding, which is the type of 12-month finding at issue in this case, is a "warranted but precluded" finding. To find that a petitioned action is "warranted but precluded," the Secretary must conclude that, although listing the species is warranted, "the immediate proposal and timely promulgation of a final regulation implementing the petitioned action . . . is precluded by pending proposals to determine whether any species is

---

"candidate assessment process."

an endangered species or a threatened species." 16 U.S.C. § 1533(b)(3)(B)(iii)(I). The Service must also find that "expeditious progress is being made to add qualified species" to the threatened or endangered lists, and to remove species that are no longer qualified. Id. at § 1533(b)(3)(B)(iii)(II). The Service must publish warranted-but-precluded findings in the Federal Register, "together with a description and evaluation of the reasons and data on which the finding is based." Id. at § 1533(b)(3)(B)(iii).

A finding of "warranted but precluded" means that the Service will not immediately begin the process of developing a proposed rule to add that species to the list of threatened and endangered species. Species whose listing has been found to be warranted-but-precluded are known as "candidate species." The Service is required to monitor the status of candidate species and "make prompt use" of its emergency listing authority "to prevent a significant risk to the well being of any such species." 16 U.S.C. § 1533(b)(3)(C)(iii). The publication of a warranted-but-precluded finding also serves as notice that the Service is actively seeking information regarding the status of the species. The Service is required to annually issue a new 12-month finding updating the status of all warranted-but-precluded species. See 16 U.S.C. § 1533(b)(3)(C)(i); see also, e.g., 74 Fed. Reg. 57,804, 57,812 (Nov. 9, 2009).[2] Although candidate species do not receive the protections the ESA affords to listed species, the Service provides other federal agencies with the list of candidate species in order to encourage conservation measures to protect them. See 50 C.F.R. § 402.12(d).

## II. The Roles of the Courts and Congress in Driving Listing Program Priorities

The Service's discretion in allocation of listing program funds has long been limited by

---

[2] The Service publishes these annual findings, along with its reviews of the conservation status of each candidate species, in a Federal Register document known as the Candidate Notice of Review ("CNOR").

court decisions and statute. In 1997, the Service's workload of critical habitat designations began to increase sharply in response to litigation and court decisions.[3] To protect the appropriations for other Service programs from the litigation-driven listing program, Congress has included a provision in each appropriation since FY 1998 expressly prohibiting the Service from allocating additional agency funds for the listing program beyond the amount specified for that fiscal year's appropriation (the "Listing Cap").[4] "Department of the Interior and Related Agencies Appropriations Act", 1998, Pub. L. 105-83, 111 Stat. 1543, 1547. Subsequently, beginning in FY 2002, in response to additional litigation requiring the Service to devote still more listing program resources to critical habitat designations,[5] Congress prohibited the Service from expending more than a specified amount on designating critical habitat for already listed species (the "critical habitat subcap").[6] Congress recognized that "the amount provided for the

---

[3] If critical habitat is not "determinable" at the time of listing, the Secretary has an additional year to designate critical habitat "to the maximum extent prudent." 16 U.S.C. § 1533(b)(6)(C)(ii). In 1997, the Ninth Circuit overturned the Service's finding that designation of critical habitat for the coastal California gnatcatcher was "not prudent." Natural Res. Def. Council v. U.S. Dep't of Interior, 113 F.3d 1121 (9th Cir. 1997). This decision and subsequent district court decisions adopting its conclusions led to a series of lawsuits requiring the Service to reconsider previous "not prudent" findings.

[4] See, e.g., H.R Rep. No. 107-103, *13, 107th Cong., 1st Sess (June 19, 2001) ("The language recommended reflects the Committee's concern that a balance is maintained between the listing program and other critical Service programs, including other endangered species activities, within the amount of money provided to the Service for fiscal year 2002.").

[5] In 1999, a 10th Circuit opinion in effect required the Service to designate overdue critical habitat immediately, exacerbating the degree to which work on critical habitat designations competed with other listing actions. See Forest Guardians v. Babbitt, 164 F.3d 1261 (10th Cir. 1998), amended and reprinted, 174 F.3d 1178 (10th Cir. 1999). In May 2001, the Tenth Circuit held that the Service's approach to the economic analysis required as part of the process of designating critical habitat was unlawful. New Mexico Cattle Grower's Ass'n v. U. S. Fish and Wildlife Serv., 248 F.3d 1277 (10th Cir. 2001). These cases resulted in the requirement to redesignate critical habitat for many species, added to the number of critical habitat designations that were required under settlements, and made it difficult to meet all of the Service's deadlines with available funds.

[6] Beginning in 2002, the Service tracked its activities with respect to critical habitat designations

endangered species listing program will not address fully the current backlog and potential new listing workload." H.R Rep. No. 107-103, *13, 107th Cong., 1st Sess (June 19, 2001). It explained that the critical habitat designation subcap would ensure "that some funding" is available to address other listing activities. Id. Thus, Congress clearly understood when it limited the amount of funding for actual listing that its action would not enable the Service to fully address its listing backlog.

In recent years, a large number of citizen listing petitions and the resulting statutory and court-ordered deadlines have further limited the availability of discretionary funds available to address candidate species such as the sage-grouse that are identified as otherwise warranting listing. Between 2007 and 2010, the Service received 80 petitions seeking the listing of 1,253 species. See Declaration of Gary Frazer, ("Frazer Decl."), ¶ 11(b) (attached as Exhibit 1). Between 2008 and 2010, 18 lawsuits were filed seeking to enforce nearly 900 petition deadlines. Id. To put this into perspective, between 1994 and 2006, the Service received an average of 17 petitions to list 20 species as endangered or threatened per year. Id.

The Service develops proposed listing rules for candidate species to the extent its listing program funding allows. Beginning in FY 1998 and continuing to the present, Congress has imposed a "Listing Cap" in the Service's annual appropriation that states the amount the Service may spend on listing actions and expressly prohibits the Service from allocating additional funds for the listing program. See, e.g., Pub. L. 105-83, 111 Stat. 1543 (1997). The Service applies biology-based Listing Priority Guidelines that rank the candidate species according to their taxonomic significance and the relative magnitude and imminence of the threats they face. See Endangered and Threatened Species Listing and Recovery Priority Guidelines, 48 Fed. Reg.

---

for already-listed species under the budget category "1117" and its other listing activities under

43,098 (Sept. 21, 1983) ("Listing Priority Guidelines"); see also *infra* at 30-32.

## FACTUAL AND PROCEDURAL BACKGROUND

### I.     The Greater Sage-Grouse

The greater sage-grouse (*Centrocercus urophasianus*) is the largest North American grouse species. 75 Fed. Reg. at 13,912. The sage-grouse depends on large areas of contiguous sagebrush habitat for nesting, cover, and food sources. Id. at 13,915-16. Such habitat is found in the intermountain lowlands in the western United States. Id. at 13,916. The sage-grouse now occurs in eleven states (Washington, Oregon, California, Nevada, Idaho, Montana, Wyoming, Colorado, Utah, South Dakota, and North Dakota) and two Canadian provinces (Alberta and Saskatchewan), occupying about 56 percent of its historical range. Id. at 13,916.

While sage-grouse population estimates carry considerable scientific uncertainty, scientists believe the species has undergone long-term population declines in the past 43 years, with an annual rate of decline of about 1.4 percent during the past two decades. See 75 Fed. Reg. at 13,921-23. Historical estimates place the total historical population (late 1800s-early 1900s) in the range of 1.6-16 million birds, while contemporary population estimates are in the range of 100,000-500,000 birds. See id. at 13,921.

### II.    The 2010 12-Month Finding Challenged in This Litigation

At issue in this litigation is the Service's 12-Month Finding, published March 23, 2010, in which the Service concluded that listing the sage-grouse as threatened or endangered was warranted but precluded, both rangewide and for the Bi-State DPS. 75 Fed. Reg. at 13,910.

####     A.     The Analysis of Whether Listing the Sage-Grouse Was "Warranted"

The Service determined that listing the sage-grouse was warranted based on a

---

the budget category "1111."

combination of threats. Agriculture, urbanization, infrastructure development, invasive plants, and energy development had already eliminated almost half of the species' historical habitat, and much of the remainder was becoming fragmented. Id. at 13,986. The Service found that habitat loss and fragmentation were likely to increase due to climate change, and available techniques for restoring sagebrush habitat were "limited and generally ineffective." Id. The Service also found that the sage-grouse has two strongholds of large areas of contiguous habitat in the southwest Wyoming Basin and the Great Basin area straddling Oregon, Nevada and Idaho. Id. However, habitat fragmentation was occurring even in those areas due to wildfire, invasive species, and energy development. Id. at 13,958. Scientists predicted that in most areas the sage-grouse would undergo significant declines by the year 2037 if current trends continued. Id. at 13,960-61.

In the same 12-Month Finding, the Service also found that listing of the Bi-State DPS of the sage-grouse in California and Nevada (also known as the "Mono Basin population")[7] was warranted but precluded by higher-priority listing actions. Id. at 13,990-993, 14,006. Threats to the Bi-State DPS were similar in nature to those facing the sage-grouse rangewide, but were magnified due to the smaller size and relative isolation of this population. See id. at 14,006, 14,009. The Service predicted that within 30 years, the Bi-State population would likely persist in only two isolated populations. Id. at 14,006.

In addition, the 12-Month Finding assessed a proposal to list the "Western subspecies" of greater sage-grouse. However, the Service found that there was insufficient scientific information to support the existence of a separate Western subspecies, so it could not be considered a listable entity. Id. at 13,988. This determination had implications for the so-called

---

[7] The Mono Basin population consists of approximately 3,000 birds in four populations

"Columbia Basin population," or "Washington population" of greater sage-grouse. The Service had issued a 12-month finding of warranted-but-precluded for this population in 2001, based on the view that it constituted a listable DPS of the Western subspecies of sage-grouse. See 66 Fed. Reg. 22,984 (May 7, 2001). While the 12-Month Finding did not actually make any new findings with respect to the Columbia Basin population, it noted that its status should now be reassessed in light of the new finding that there is no Western subspecies. See 75 Fed. Reg. at 13,988.

B.     The Preclusion Findings for the Sage-Grouse

As described earlier, the Service must prioritize listing actions because the listing program has a limited budget and the Service is statutorily prohibited from reallocating funds from other programs by the Listing Cap. See *supra* at 5-7. The 12-Month Finding concluded that listing of the sage-grouse and the Bi-State DPS was "warranted but precluded by higher priority listing actions." 75 Fed. Reg. 13,910, 14,007; see also 16 U.S.C. § 1533(b)(3)(B)(iii). The Service explained in the 12-Month Finding that "[p]reclusion is a function of the listing priority of a species in relation to the resources that are available and competing demands for those resources." 75 Fed. Reg. at 14,007. In FY 2010, Congress appropriated $10,471,000 to the Listing Program. The Service determined that an additional $1,114,417 of critical habitat subcap funds were available for other listing activities, bringing the total to $11,585,417. Id. at 14,008. As a result of the Listing Cap, these were the only funds available for all listing actions in FY 2010. Id. Proposal of a listing rule for sage-grouse rangewide and for its Bi-State DPS were precluded because available funding for FY 2010 was completely absorbed by higher-priority listing program activities, including (consistent with the Service's prioritization process): activities subject to deadlines in court orders and court-approved settlement agreements; actions

straddling the California-Nevada border.

with statutory deadlines; and essential litigation-related, administrative, and listing program management functions. 75 Fed. Reg. at 14,008.

The funds that remained after allocation to these priorities, approximately $1.45 million, were to be allocated to preparing listing rules for candidate species that had a higher threat-based priority ranking than the sage-grouse. Id. at 14,008; see also 3924 AR 040302 (March 2010 budget allocation table).[8] As explained in more detail below (see infra at pages 30-32) the Service ranks candidate species according to their degree of imperilment under its Listing Priority Guidelines. See 48 Fed. Reg. 43,098. This system ranks candidate species on a scale of 1 to 12, with 1 being the highest priority and 12 being the lowest. These ranking numbers are referred to as Listing Priority Numbers, or "LPNs." The Service assigned an LPN of 8 to the sage-grouse, and an LPN of 3 to the Bi-State DPS. See 75 Fed. Reg. at 14,008-09. At the time, all of the listing actions that were being funded in the Service's listing program budget involved species that were either the subject of court-enforced or statutory deadlines, or that were ranked as being more highly threatened than the sage-grouse.[9] See id. at 14,010-14. As required by the ESA, the Service also made a finding that "expeditious progress is being made to add or remove qualified species to and from the Lists of Endangered and Threatened Wildlife and Plants." See 75 Fed. Reg. at 14,010; see also 16 U.S.C. § 1533(b)(3)(B). In support of this finding, the 12-Month Finding provided tables and data on the listing activities completed and ongoing during FY 2010. See 75 Fed. Reg. at 14,010-14; see also infra at 20-21, 26.

---

[8] References to the Administrative Record will be formatted herein as: "[Document number] AR [Page number]," so the above reference is to pages 040300-302 of AR document number 3924.
[9] It should be noted that these higher-priority listing actions sometimes involved multiple species with a mix of priority rankings. In some cases, these multiple-species actions included both high-priority species and species that received a lower priority ranking: these lower-priority species were included if they overlapped geographically with the higher-priority species or faced similar threats, and could thus be efficiently addressed in a single listing rule. See 75 Fed. Reg. at

### III.    The MDL Settlement Agreements

As discussed further below, in September 2011, the landscape for the Service's listing program changed when the District Court for the District of Columbia approved settlement agreements in a consolidated multi-district litigation proceeding between the Service and two of the three original plaintiffs in the present action. See *infra* at 13-20. In exchange for some relief from the burden of ESA litigation, these agreements committed the Service to a comprehensive plan to clear the entire backlog of 251 candidate species, including the greater sage-grouse, by the end of FY 2016. Under this judicially-enforceable workplan, the Service will issue, pursuant to the ESA, proposed listing rules or "not warranted" findings for the sage-grouse by the end of FY 2015, and the Bi-State DPS by the end of FY 2013. Plaintiff Center for Biological Diversity ("the Center") has moved to withdraw from this case as plaintiff, and Plaintiff Guardians has agreed to join with the Service in moving to dismiss this action with prejudice. See id.

### STANDARD OF REVIEW

Summary judgment must be granted if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A court reviews allegations that an agency action does not comport with ESA requirements under the scope and standard of review provided by the APA. See Village of False Pass v. Clark, 733 F.2d 605, 609 (9th Cir. 1984). The APA empowers a court to "hold unlawful and set aside" agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Under the APA standards of review, the agency decision is "entitled to a presumption of regularity." Citizens to Pres. Overton Park v. Volpe, 401 U.S. 402, 415 (1971). The court's only function is to determine whether the Secretary "has considered the relevant

---

14,008.

factors and articulated a rational connection between the facts found and the choice made."
Baltimore Gas & Elec. Co. v. Natural Res. Def. Council, 462 U.S. 87, 105 (1983) (citation
omitted). A reviewing court "is not to substitute its judgment for that of the agency," and should
"uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned."
FCC. v. Fox Television Stations, 556 U.S. 502 (2009) (citations omitted). Where, as here, the
agency's technical expertise is involved, the court defers to the agency's expertise. FCC v.
National Citizens Comm. for Broad., 436 U.S. 775, 813-18 (1978). In the face of conflicting
scientific opinions, "an agency must have discretion to rely on the reasonable opinions of its own
qualified experts even if, as an original matter, a court might find contrary views more
persuasive." Marsh v. Oregon Natural Res. Council, 490 U.S. 360, 378 (1989). The ESA best-
available-data requirement "merely prohibits [an agency] from disregarding available scientific
evidence that is in some way better than the evidence [it] relies on." Kern County Farm Bureau
v. Allen, 450 F.3d 1072, 1080 (9th Cir. 2006) (citation omitted, alterations in original).

An agency's interpretation of an ambiguous statute is entitled to deference as long as it is
a "permissible interpretation." See Chevron U.S.A. v. Natural Res. Def. Council, 467 U.S. 837,
842-43 (1984); United States v. Mead Corp., 533 U.S. 218, 226-27 (2001). An agency's
interpretation of its own guidelines is "entitled to great deference," Espinoza v. Farah Mfg. Co.,
414 U.S. 86, 94 (1973), and should only be overturned if it is "plainly erroneous or inconsistent
with" the guidelines. Forest Guardians v. U.S. Forest Serv., 329 F.3d 1089, 1098 (9th Cir. 2003).

## ARGUMENT

I.    **The Court Should Exercise its Equitable Discretion to Dismiss This Case Because the Issues Have Already Been Resolved by the MDL Agreements.[10]**

---

[10] This section constitutes the argument in support of the Service's and Guardians' Joint Motion to Dismiss.

As the Service will explain further below, WWP's challenges to the 12-Month Finding on the sage-grouse are without merit.[11] However, the Court should not reach the merits, but rather should grant the Service and Guardians' joint motion to dismiss this action as prudentially moot under the MDL Settlement Agreements. The same outcome is also called for under general principles of judicial comity among the federal courts.

A.      The MDL Agreements

Two of the original Plaintiffs in this case, Guardians and the Center, have entered into separate settlement agreements with the Service in multi-district litigation consolidated before District Judge Emmet G. Sullivan in the U.S. District Court for the District of Columbia that resolve the issues in this case ("Settlement Agreements" or "MDL Agreements"). Judge Sullivan approved these Settlement Agreements on September 9, 2011. In re Endangered Species Act Section 4 Deadline Litig., Misc. Action No. 10-377 (EGS), MDL Docket No. 2165 (D.D.C.) ("ESA Section 4 MDL"), MDL Docket ("Dkt.") 55 and 56.[12] Together, these Settlement Agreements provide for the Service's completion of a proposed listing rule or not-warranted finding for the sage-grouse by the end of FY 2015, and for the Bi-State DPS by the end of FY 2013. See MDL Dkt. 31-1 ("First MDL Agreement") ¶ 2; MDL Dkt. 42-1 ("Second MDL Agreement") ¶ B(3)(c) (attached as Exhibits 2 and 3, respectively).

Under the six-year term of the First MDL Agreement between the Service and Guardians, subject to certain conditions and limitations, the Service has agreed to complete initial petition findings for over 600 species and to issue proposed listing rules or not-warranted findings for at

---

[11] As stated above, Plaintiff Guardians takes no position on the merits of WWP's claims, but joins with the Service's argument that this Court should not reach the merits for the reasons stated below.

[12] Intervenor-Applicant Safari Club International has appealed the approval of these Agreements and the denial of its motion to intervene. See MDL Dkt. 57.

least 251 candidate species. First MDL Agreement ¶¶ 1, 2 (Exh. 2). In exchange for the

Service's substantial workload commitment, Guardians has agreed not to sue the Service on

allegedly untimely petition findings or to challenge the Service's progress in listing candidate

species during the term of the First MDL Agreement. Id. ¶ 9. Under the First MDL Agreement,

Guardians also agreed to move to dismiss this sage-grouse litigation with prejudice. Id. ¶ 12.

On July 12, 2011, the Service and the Center entered into the Second MDL Agreement,

which resolves the Center's claims in the ESA Section 4 MDL. Second MDL Agreement (Exh.

3). Pursuant to this Agreement, the Center has moved to withdraw from the present sage-grouse

litigation, and to not oppose the First MDL Agreement.[13] Id. ¶¶ B(6), (8); see also Dkt. 81.

B.     The MDL Agreements Resolve The Disputes in This Case.

Plaintiff WWP is not a party to either MDL Settlement Agreement. However, approval of

these Settlement Agreements renders its claims prudentially moot. The doctrine of prudential

mootness "permits a court, in its discretion, to dismiss a case when 'a controversy, though not

moot in the strict Article III sense, is so attenuated that considerations of prudence and comity

for coordinate branches of government counsel the court to stay its hand, and to withhold relief it

has the power to grant.'" Natural Res. Def. Council v. Norton, No. 1:05-CV-01207 OWW LJO,

2007 WL 14283, at *7 (E.D. Cal. Jan. 3, 2007) (quoting Sierra Club v. Babbitt, 69 F. Supp. 2d

1202, 1244 (E.D. Cal. 1999)) (attached as Exhibit 4); see also Ali v. Cangemi, 419 F.3d 722,

723-24 (8th Cir. 2005) (noting that "even if a court has jurisdiction under Article III to decide a

case, prudential concerns may militate against the use of judicial power"). The doctrine has

"particular applicability" in cases where relief is sought in the form of an injunction against

---

[13] The Center also agreed to use its best efforts to obtain the agreement of Plaintiff Western
Watersheds Project to file a joint motion to dismiss the sage-grouse litigation. See Second MDL
Agreement ¶ B(9). The Center further agreed that the deadlines in the Second MDL Agreement

government. <u>Norton</u>, 2007 WL 14283, at *7 (quoting <u>Southern Utah Wilderness Alliance v.</u> <u>Smith</u>, 110 F.3d 724, 727 (10th Cir. 1997)). A court should "decline to grant declaratory or injunctive relief where the government 'has already changed or is in the process of changing its policies or where it appears that any repeat of the actions in question is otherwise highly unlikely." <u>Id</u>. (quoting <u>Building and Constr. Dep't v. Rockwell Int'l Corp.</u>, 7 F.3d 1487, 1492 (10th Cir. 1993)); <u>accord</u> <u>Oregon Natural Res. Council v. Keys</u>, No. Civ. 02–3080–CO, 2004 WL 1048168, at *10 (D. Or. May 7, 2004) (attached as Exhibit 5).

The MDL Agreements address not only the status of the sage-grouse, but also the underlying issues that led to this status. As Guardians and the Service jointly described the situation prior to the approval of the MDL Agreements:

> At present, there are a significant number of pending listing petitions . . . that will require [statutorily mandated] 90-day and 12-month findings by the Service pursuant to the first step of the listing process <u>and</u> a significant number of 'candidate' species for which the Service has previously determined that listing is warranted but the agency lacks sufficient resources to complete the last step of the listing process in order to put in place the protections of the Act (*i.e.*, species for which the Service has made warranted-but-precluded findings). *This growing dual backlog of petition findings and candidate species effectively precludes the Service from responding timely to petitions at the beginning of the listing process while at the same time adding species to the list of endangered or threatened species at the end of the process.*

Jt. Mot. for Approval of Settlement Agreement, MDL Dkt. 31, at 23 (italics added). Under the MDL Agreements, the Service has committed to an unprecedented workload in order to "balance[] Congress's intent that the Service timely make findings on citizen listing petitions <u>and</u> conduct rulemakings to list species that need the protections of the ESA." <u>Id</u>. at 12 (emphasis added). Guardians and the Service agree that the timetables provided for in their Agreement "constitute expeditious progress in adding qualified species to the lists of threatened and

could be adjusted if the Center filed additional ESA listing lawsuits. <u>Id</u>. at ¶ B(10).

endangered species" and "provide[s] for the Service's orderly administration of its Listing Program." First MDL Agreement ¶ 10.

WWP will likely argue that this case is not moot because it seeks an injunction mandating that the Service immediately propose listing rules on the sage-grouse and Bi-State DPS, and would likely argue that the dates already set by the MDL Agreements are not soon enough. See Pl.'s Amended Compl. at 29; see also Pl.'s Mem. at 40 (urging the Court to order the Service "issue a final proposed listing rule within 90 days."). But the form of relief sought by WWP—action moving the greater sage-grouse and Bi-State DPS off the candidate species list—is already required under the orders of the MDL Court, and this dispute has become attenuated into a debate about scheduling an action that all parties now agree will be performed by a date certain. It must be remembered that prudential mootness is an equitable doctrine, not a jurisdictional one, and a claim can be prudentially moot even if there is the theoretical possibility of some form of additional relief. Furthermore, the dispute is largely academic at this point because WWP's requested remedy is unrealistic and unwarranted, even if WWP's challenges to the 12-Month Finding were found to have merit. Were this Court to hold that the 12-Month Finding was arbitrary and capricious, it is simply infeasible for the Service to issue a proposed listing rule on the sage-grouse within 90 days. See Frazer Decl. ¶¶ 22, 29, 31.[14] WWP's demand also seems to be based on the erroneous belief that the Service has already started work on such a rule, which it has not. See infra at 21; see also Frazer Decl. ¶ 30.

In addition, even if the Court were to hold for WWP on the merits, a court sitting in review of agency action is not generally empowered to conduct a de novo inquiry, and if a warranted-but-precluded finding were found deficient under the APA standards of review, the

---

[14] Plaintiff WildEarth Guardians takes no position on the factual representations made in this

appropriate course of action would be remand of the 12-Month Finding, not an order directing the Service to issue a proposed rule. See Asarco, Inc. v. EPA, 616 F.2d 1153, 1160 (9th Cir. 1980); accord Florida Power & Light Co. v. Lorion, 470 U.S. 729, 744 (1985); Federal Power Comm'n v. Idaho Power Co., 344 U.S. 17, 20 (1952).

In weighing the equities, this Court should also take into consideration judicial comity and the public interest in deference to the MDL Agreements being enforced by the MDL Court. The MDL Agreements were reached based on the consolidation of multiple ESA listing actions involving hundreds of species, and represented an unprecedented effort to strike a balance between the allocation of resources to petition findings and the allocation of resources to resolving the status of candidate species. See Frazer Decl. ¶¶ 14-18. These Agreements were the product of ten months of intensive negotiation assisted by a court-appointed mediator. See id. ¶ 17. The 90-day injunction sought by WWP would be inconsistent with the carefully crafted, comprehensive effort to set the ESA listing program on a new footing and clear the backlog of candidate species.[15] It would put the sage-grouse ahead of many other species that are more imperiled. See id. ¶ 24. It would also set a precedent encouraging other litigants and other courts to repeatedly rearrange the listing program priorities without regard for the effect on the continued viability of the workplan being enforced under the MDL Agreements. See id. ¶¶ 22-28. As the Supreme Court has noted, "principles of *stare decisis* and comity among courts generally suffice to mitigate the sometimes substantial costs of similar litigation brought by different plaintiffs." Smith v. Bayer Corp., 131 S. Ct. 2368, 2381 (2011). Thus, "[w]hen an injunction sought in one federal proceeding would interfere with another federal proceeding,

---

Declaration, as it has no ability to confirm the veracity of the statements made therein.
[15] The MDL Agreements collectively address all of the candidate species included in the Service's 2010 Candidate Notice of Review. See 75 Fed. Reg. 69,222 (Nov. 10, 2010).

considerations of comity require more than the usual measure of restraint, and such injunctions should be granted only in the most unusual cases." <u>Bergh v. Washington</u>, 535 F.2d 505, 507 (9th Cir. 1976) (citation omitted); <u>see also</u> <u>DeMaurez v. Swope</u>, 110 F.2d 564, 565 (9th Cir. 1940) (noting it is "injudicious for one judge of equal rank and power to review identical matters passed upon by his colleague.") (citations omitted); <u>West Gulf Maritime Ass'n v. ILA Deep Sea Local 24</u>, 751 F.2d 721, 728 (5th Cir. 1985) ("The federal courts long have recognized that the principle of comity requires federal district courts—courts of coordinate jurisdiction and equal rank—to exercise care to avoid interference with each other's affairs."); <u>Feller v. Brock</u>, 802 F.2d 722, 727-28 (4th Cir. 1986) ("Prudence requires that whenever possible, coordinate courts should avoid issuing conflicting orders . . . ."); <u>California ex rel. Lockyer v. U.S. Dep't of Agric.</u>, 710 F. Supp. 2d 916, 924 (N.D. Cal. 2008) (holding that "the particular circumstances in this case warrant a partial stay of the injunction in order to further judicial comity by minimizing the conflict between different jurisdictions . . . ."), <u>aff'd</u>, 575 F.3d 999 (9th Cir. 2009).

Nor should these equitable principles apply with any less force merely because the court orders in question were issued in approval of settlement agreements. To the contrary, there is a "strong judicial policy that favors settlements of disputes." <u>Guerrero v. RJM Acquisitions LLC</u>, 499 F.3d 926, 939 (9th Cir. 2007) (citation omitted). Under appropriate circumstances, court orders enforcing a settlement agreement can even have the same *res judicata* effect as a final judgment on the merits. <u>See, e.g.</u>, <u>Reyn's Pasta Bella v. Visa USA</u>, 442 F.3d 741, 764 (9th Cir. 2006). As one federal court has noted, "where a government agency charged with protecting the public interest has pulled the laboring oar in constructing the proposed settlement, a reviewing court may appropriately accord substantial weight to the agency's expertise and public interest responsibility." <u>Bragg v. Robertson</u>, 83 F. Supp. 2d 713, 717 (S.D. W.Va. 2000), <u>aff'd sub nom</u>,

Bragg v. W. Va. Coal Ass'n, 248 F.3d 275 (4th Cir. 2001).

In conclusion, this Court should forebear from reaching the merits of this case, because circumstances have so changed, and the issues now presented are so attenuated, that "considerations of prudence and comity for coordinate branches of government counsel the court to stay its hand, and to withhold relief it has the power to grant." Norton, 2007 WL 14283, at *7 (quoting Sierra Club, 69 F. Supp. 2d at 1244). The Court should instead grant the Service's and Guardians' Motion to Dismiss for prudential mootness and/or hold that, due to principles of judicial comity, the Court will stay its hand and not attempt to second-guess the relief provided by the MDL Settlement Agreements approved by Judge Sullivan.

## II.     If the Court Reaches the Merits, WWP's Challenges to the 12-Month Finding Should Be Rejected

Should the Court find it appropriate to reach the merits of WWP's claims, it should reject WWP's arguments that the 12-Month Finding was arbitrary and capricious.

### A.     The Preclusion Portion of the 12-Month Finding Was Reasonable and Well-Supported by the Law and the Administrative Record.

Congress has stated that the availability of judicial review of warranted-but-precluded findings allows a reviewing court to "separate justifications grounded in the purposes of the act from the foot-dragging efforts of a delinquent agency." H.R. Conf. Rep. 97-835, *3, reprinted at 1982 U.S.C.C.A.N. 2860, 2863 (1982). In issuing a warranted-but-precluded finding on the sage-grouse, the Service rationally prioritized its listing program resources in compliance with applicable law.

#### 1.     The Service's Preclusion Finding is Well Supported by the Record.

A preclusion determination should be affirmed if the Service is "actively working on other listings and delistings and [] determine[s] and publish[es] a finding that such work has

resulted in pending proposals which *actually* preclude proposing the petitioned action at that time." <u>Center for Biological Diversity v. Norton</u>, 254 F.3d 833, 838 (9th Cir. 2001) (emphasis in original) (quoting H. Conf. Rep. No. 97-835, reprinted in 1982 U.S.C.C.A.N. 2860, 2863). The Service fulfilled these requirements, and this Court should defer to the agency's "considerable scheduling discretion in the management of listing and research priorities." <u>See</u> <u>Coos County Bd. of County Comm'rs v. Kempthorne</u>, 531 F.3d 792, 808 (9th Cir. 2008).

As the 12-Month Finding noted, "through the listing cap, the critical habitat subcap, and the amount of funds needed to address court-mandated critical habitat designations, Congress and the courts have, in effect, determined the amount of money available for other listing activities." 75 Fed. Reg. at 14,007. After the Service addressed listing actions mandated by court-enforced and statutory deadlines, and allocated remaining discretionary funds to higher-priority species, there was simply no funding available to address the sage-grouse and many other candidate species that the Service has previously found warranted for proposed listing. <u>See</u> 75 Fed. Reg. at 14,009. WWP mounts no serious challenge to the idea that the Service should be able to order its priorities in such a fashion, nor to the evidence that addressing such priorities completely used up the available listing program funding. <u>See</u> 75 Fed. Reg. at 14,010-14 (providing tables listing higher-priority listing activities); <u>see also</u> 3924 AR 040300-302 (FY 2010 budget allocation table showing how available funds were being allocated to higher priority actions).

WWP mistakenly asserts that the Service had already begun drafting a final or proposed listing rule, and that therefore most of the work on the listing rule was already done. <u>See, e.g.</u>, Pl.'s Mem. at 2, 6-10. While this is not really relevant to determining whether there was funding available to do further work, it appears that WWP confuses the Service's work on drafting the

12-Month Finding with work on a proposed or final listing rule. In reality, the Service has never begun drafting a listing rule for sage-grouse. See Frazer Decl. ¶¶ 30-31. Under the ESA, there is no basis to begin a proposed (let alone final) listing rule until *after* the Service determines that such a rule is "warranted" or "warranted but precluded." See 16 U.S.C. § 1533(b)(3)(B).

WWP also argues that the Service's preclusion finding was deficient because the Service "*never even addressed* what a greater sage grouse proposed listing rule would cost at this time— the very expenditure it claims is precluded." Pl.'s Mem. at 2. The law does not require the Service to individually quantify the cost of each precluded action, a requirement that would divert the Service from actually protecting species in order to make hypothetical and unnecessary cost calculations. Given that the Service demonstrated that the entire listing program budget was going to be consumed by higher-priority activities, demonstrating that the sage-grouse rule was precluded did not require a precise determination of how much that task would cost. See 3924 AR 040300-302 (FY 2010 listing program budget allocation table from March 4, 2010).

WWP argues that the record of funding the sage-grouse 12-Month Finding shows that budgetary reserves were available that the Service could have diverted to the sage-grouse. See Pl.'s Mem. at 39-40. However, WWP assumes without justification that any funding not yet allocated to a particular species at the time of the 12-Month Finding would have been available to divert to work on the sage-grouse without regard to the many higher-priority candidate species identified in the 12-Month Finding and other documents in the record. See 75 Fed. Reg. at 14,008-14; see also 3959 AR 040575-650. The 12-Month Finding was prepared in March 2010, which was only halfway through the federal fiscal year. Plaintiff points out that at that time, $500,000 was designated in the listing budget allocation table as "Place holder for Candidate

Species," while another $511,091 was "unallocated." See Pl.'s Mem. at 40 (citing 3924 AR 040302). In fact, during the remainder of the fiscal year, these funds were allocated for higher-priority activities such as work on higher-priority candidate species. See 75 Fed. Reg. 69,222, 231, 235 (Nov. 10, 2010) and 76 Fed. Reg. 62,192, 62,211 (Oct. 6, 2011) (documenting additional high-priority candidate species addressed in FY 2010 after the issuance of the sage-grouse 12-month finding); see also Frazer Decl. ¶ 12. To cite just one of many examples, these funds were later allocated to issue a proposed listing rule for a candidate species known as the Florida bonneted bat. 76 Fed. Reg. at 62,211. Unlike the sage-grouse, this narrowly distributed species faces high-magnitude threats of extirpation, and its entire known population consists of a few hundred individuals. It thus has an LPN of 2. See 3959 AR 040578; see also Frazer Decl. ¶ 24.[16]

In Carlton v. Babbitt, a district court considered and rejected many of the same arguments that WWP makes now. See 900 F. Supp. 526, 537 (D.D.C. 1995). Plaintiffs argued that a proposal to change the listing status of the grizzly bear was not properly warranted but precluded because the Service "did not mention the costs of reclassification," that the Service "should have reallocated [] funds" from other activities, and that "the reclassification would entail an insignificant cost." Id. The court rejected all of these arguments, noting that "Plaintiffs ask the Court to read requirements into section 1533(b)(3)(B)(iii) that do not appear in the language of the statute or its legislative history." Id.

    2.    *WWP's Attacks on The LPN Determination Are Not Only Unfounded But*

---

[16] Plaintiff asserts that additional funds, such as an allocation from the Director's Deferred Allocation, which is reserved to cover unforeseen contingencies or emergencies, were available to prepare a proposed listing rule for the greater sage-grouse. See Pl.'s Mem. at 39-40. This is not correct, because the Director's Deferred Allocation funding is outside of the Listing Cap. To the extent funding from this source was used for past listing activities for the greater sage-grouse, use of this funding was in error.

*Irrelevant.*

WWP argues that the assignment of a listing priority number to the sage-grouse was politically manipulated by artificially downgrading the assessment of threats from "high" to "moderate" in order to lower this ranking and prevent listing. See Pl.'s Mem. at 2, 12-21, 29-38. These accusations are completely unfounded, as will be demonstrated below. See *infra* at 30-39. However, it is important to also note here that these allegations are also largely irrelevant to the question of whether the sage-grouse would have received a "warranted but precluded" as opposed to a "warranted" finding.

To begin with, WWP is wrong to assert that "[c]ritical to this case, species evaluated as facing a 'high' magnitude of threat are immediately listed without regard to the other criteria." See Pl.'s Mem. at 28 (citing Friends of the Wild Swan v. U.S. Fish & Wildlife Serv., 945 F. Supp. 1388, 1396 n.12 (D. Or. 1996)). Nor is it true that "preclusion depends upon a scientific assessment that the threat of extinction for sage grouse is moderate and not high." Pl.'s Mem. at 34. There is no such policy, rule, or practice. WWP simply misreads the cited case, which actually says: "under FWS's guidelines, *only* species evaluated as facing a 'high' magnitude of threat are immediately listed." Friends of the Wild Swan, 945 F. Supp. at 1397 n.12 (emphasis added). While it is often the case that only species facing high magnitude of threats are immediately listed, it is manifestly *not* the case that *all* species facing high magnitude of threats are immediately listed. In fact, there are many such species (with LPN of 2) which are not immediately listed. See 75 Fed. Reg. at 14,008, 14,014. For example, the Gunnison sage-grouse, a close relative of the greater sage-grouse that faces threats of "high" magnitude and has an LPN of 2, recently received a warranted-but-precluded finding. 75 Fed. Reg. 59,804 (Sept. 28, 2010). Another example, of course, is the Bi-State DPS of the greater sage-grouse, found warranted-

but-precluded in spite of facing high magnitude, imminent threats and receiving an LPN of 3, the highest possible ranking for a DPS. See 75 Fed. Reg. at 14,009; see also infra at 30-32.

As explained further below (see infra at 30-32), the highest possible LPN ranking that could have even theoretically been assigned to the greater sage-grouse rangewide, even if it had been found to face "high" magnitude threats, was an LPN of 2, since the sage-grouse is not a "monotypic genus" (that is, a species that is the sole species in its genus). Listing the greater sage-grouse would have almost certainly been found warranted but precluded even if it had been found to face "high" magnitude threats and received an LPN of 2. At the time of the sage-grouse 12-Month Finding, there were already 56 candidate species with an LPN of 2 that were ahead of the sage-grouse on the candidate list. 75 Fed. Reg. at 14,008. After the Service addresses court-enforced and statutory listing deadlines, it allocates its remaining discretionary funding to addressing, to the degree it can, the backlog of highest-priority candidate species. These are usually species that are at a higher danger of extinction in the nearer-term than the sage-grouse due to having populations with very small size and very limited distribution. See 75 Fed. Reg. at 14,008, 14,014. In light of this backlog of highly imperiled candidate species, it is exceedingly rare for any species to bypass the candidate list and go directly from "warranted" determination to immediate proposal of a listing rule. One example of such a species is the Franciscan Manzanita, a plant species whose entire wild population consists of *one individual plant*. See 76 Fed. Reg. 55,623 (Sept. 8, 2011). The sage-grouse, whose population numbers in the hundreds of thousands across eleven states, with large strongholds of contiguous habitat, is not the kind of species likely to bypass the candidate list. See Frazer Decl. ¶ 24. WWP's hypothesized political manipulation of the priority ranking would thus almost certainly have had no effect on whether the sage-grouse received a warranted-but-precluded 12-month finding.

B.    The Service Amply Demonstrated its Expeditious Progress.

The ESA requires that the Service support its warranted-but-precluded finding with a finding that "expeditious progress is being made to add qualified species to either of the lists . . . and to remove from such lists species for which the protections of this chapter are no longer necessary." 16 U.S.C. § 1533(b)(3)(B)(iii)(II). Such a finding should be affirmed if the Service "determine[s] and present[s] evidence that [it] is, in fact, making expeditious progress in the process of listing and delisting other species." Center for Biological Diversity v. Norton, 254 F.3d at 838 (quoting H. Conf. Rep. No. 97-835). The Service fully met these requirements.

The 12-Month Finding states that expeditious progress is "that amount of work that can be achieved with $10,471,000, which is the amount of money that Congress appropriated for the Listing Program." 75 Fed. Reg. at 14,008. The Service explained the array of factors that determine how many listing actions can be funded by this appropriation:

> The work involved in preparing various listing documents can be extensive and may include, but is not limited to: gathering and assessing the best scientific and commercial data available and conducting analyses used as the basis for our decisions; writing and publishing documents; and obtaining, reviewing, and evaluating public comments and peer review comments on proposed rules and incorporating relevant information into final rules. The number of listing actions that we can undertake in a given year also is influenced by the complexity of those listing actions; that is, more complex actions generally are more costly. For example, during the past several years, the cost (excluding publication costs) for preparing a 12-month finding, without a proposed rule, has ranged from approximately $11,000 for one species with a restricted range and involving a relatively uncomplicated analysis, to $305,000 for another species that is wide-ranging and involved a complex analysis.

Id. at 14,007. The 12-Month Finding provides ample evidence of the Service's expeditious progress during FY 2010, the year in which the sage-grouse finding was made. This included nineteen completed listing actions covering 229 different species. See 75 Fed. Reg. at 14,010. These included final and proposed listing rules, statutorily mandated petition findings, and other

actions. Id. The Service also provided information on actions funded in FY 2010 but not yet completed, including 16 listing actions subject to court orders or settlement agreements, covering 26 different species; 75 listing actions subject to mandatory statutory deadlines, covering 376 species; and 12 additional proposed listing rules covering 63 different species. Id. at 14,014.[17] WWP offers no valid reason why these accomplishments do not constitute expeditious progress. See also Center for Biological Diversity v. Norton, No. CV S-03-1758 GEB/DAD, slip op. at 16 (E.D. Cal June 22, 2004) (affirming "expeditious progress" finding based on six final listings, three emergency listings, and three proposed listings).

WWP argues that the Service has failed to make expeditious progress, but fails to provide any evidence other than the conclusory assertion that the completion of final rules listing 53 species between January 2001 and March 2010 "is hardly a record of progress, let alone expeditious progress." Pl.'s Mem. at 39. WWP provides no basis for this conclusion, except for an artificially narrow interpretation of the statute under which an "expeditious progress" finding must be based only on "final rules listing a species as endangered," cannot include petition findings mandated by the ESA, and cannot take into account the availability of funding. See Pl.'s Mem. at 38-39.

The Court should reject WWP's unreasonable interpretation of the statute, and defer to the Service's reasonable interpretation. The term "expeditious progress" is ambiguous and undefined by the ESA. See 16 U.S.C. § 1532 (providing ESA's definitions). Where "the statute is silent or ambiguous with respect to the specific issue," the Court must proceed to Chevron step two and analyze "whether the agency's answer is based on a permissible construction of the

---

[17] For efficiency, these higher-priority listing rules sometimes involve multiple species with a mix of priority rankings, including lower priority species that overlap geographically with the higher-priority species or face similar threats, and could thus be efficiently addressed in a single

statute." <u>Chevron USA v. Natural Res. Def. Council</u>, 467 U.S. 837, 843 (1984).

WWP's strained interpretation requires that "expeditious progress" only be measured in terms of completed listing rules, and without any regard for availability of funding. However, the ESA does not say that; rather, it requires that the Service show "expeditious progress" in adding or removing species from the lists. The Service's interpretation of "expeditious progress" as the amount of work that can be achieved in the listing program given the amount appropriated by Congress, including work on final and proposed listing rules and petition findings, is reasonable.

Equating "progress" with only completed listings defies the statute's plain meaning. The dictionary defines "progress" as "[m]ovement toward a goal." <u>Webster's II New College Dictionary</u>, 884 (2001). It is reasonable for the Service to count the work it performs in meeting the statutorily defined milestones of the ESA listing process as "progress" toward listing and delisting species; just as a homebuilder could reasonably claim "expeditious progress" in building homes not only for the homes she completed, but also for the sites she had surveyed, the land she had purchased, and the foundations she had poured. The legislative history supports the view that "progress" is not limited to completed listing rules. Congress has stated that the Secretary "must determine and present evidence that he is, in fact, making expeditious progress in the **process** of listing and delisting other species." H.R. Conf. Rep. 97-835, *3, reprinted at 1982 U.S.C.C.A.N. 2860, 2863 (1982) (emphasis added); <u>accord</u> <u>Center for Biological Diversity v. Norton</u>, 254 F.3d at 838.

Nor is there any reason to accept WWP's view that petition findings do not constitute "progress" when they are findings of "not warranted" or "warranted but precluded." <u>See</u> Pl.'s Mem. at 38. To make progress toward listing species, the Service cannot choose to allocate funds

---

listing rule. <u>See</u> 75 Fed. Reg. at 14,008.

only to "warranted" findings; rather, it can only progress by making the required findings (to the extent funding allows), and allow the outcomes to be dictated by the scientific evidence and the ESA listing standards. In short, the Service amply demonstrated expeditious progress, and WWP offers no facts or valid legal argument for holding this finding arbitrary and capricious.

WWP also states that "an asserted lack of appropriations" is not a proper basis for an expeditious progress finding. Pl.'s Mem. at 2-3. In support of this, WWP cites Center for Biological Diversity v. Norton, 304 F. Supp. 2d 1174, 1179-80 (D. Ariz. 2003). That case does not address the present circumstances at all, but rather addresses the question of whether a lack of sufficient funding is grounds for the Service to be granted equitable relief from a court-imposed deadline. See Center for Biological Diversity, 304 F. Supp. 2d at 1179-80. In contrast, in the present case, there is an explicit statutory provision granting the Service the discretion to make a warranted-but-precluded finding based on higher priorities, see 16 U.S.C. § 1533(b)(3)(B)(iii), an express command from Congress that the Service set priorities in its listing program, see H.R. Conf. Rep. No. 97-835, reprinted in 1982 U.S.C.C.A.N. at 2,862, and express recognition by Congress that the Listing Cap will create a backlog of candidate species. See H.R. Rep. No. 107-103, 107th Cong., 1st Sess. *30 (June 19, 2001).

As additional support for the idea that budgetary limitations must be excluded from a warranted-but-precluded finding, WWP cites Center for Biological Diversity v. Kempthorne, No. C 06-07117 WHA, 2008 U.S. Dist. LEXIS 4866, 25 (N.D. Cal. Jan. 23, 2008) (Exhibit 6), a case in which a district court overturned a warranted-but-precluded finding. See Pl.'s Mem. at 2-3. That case appears to be inconsistent with Ninth Circuit precedents. The Ninth Circuit has stated that a warranted-but-precluded finding means "that a final rule cannot be issued right away, *for administrative reasons*, thereby temporarily excusing the Secretary from issuing a final

rule." <u>Center for Biological Diversity v. Norton</u>, 254 F.3d at 838 (emphasis added). In <u>Center for Biological Diversity v. Kempthorne</u>, 466 F.3d 1098 (9th Cir. 2006) (a different case than the <u>Center for Biological Diversity v. Kempthorne</u> case cited by WWP), the Ninth Circuit remanded a warranted-but-precluded finding for the Yellow-Legged Frog because the Service failed to sufficiently support its explanation that "the Service's budget is being consumed by specific pending actions." <u>Id</u>. at 1102. However, the Ninth Circuit gave no indication in its remand order that the agency's budgetary excuses were invalid, simply that such an explanation must be documented: "it may be that the homework was done, but it has to be turned in to count." <u>Id</u>. at 1103. Similarly, a D.C. District Court considered and rejected similar arguments of WWP:

> Stripped to their essence, [the Service's] basic explanations for why listing the Spineflower and other species was warranted but precluded were that [the Service] had statutorily mandated deadlines, court-ordered actions, higher priority listing activities, and a very limited budget. Despite protests from the plaintiffs, **all of these explanations are legitimate.**

<u>California Native Plant Soc'y v. Norton</u>, Civ. No. 03-1540, 2005 WL 768444, at*7 (D.D.C. 2005) (emphasis added) (attached as Exhibit 7). Those explanations are just as legitimate here.

C.    <u>The Sage-Grouse's LPN Was Determined by Science, Not Politics</u>.

WWP argues that the assignment of the sage-grouse LPN ranking was politicized, and that the scientists who prepared the 12-month finding were "countermanded" by political operatives who manipulated these priority rankings to prevent the species from being listed. While it has already been shown that this argument is largely irrelevant to the disputed warranted-but-precluded finding, some attention must be given to pointing out that WWP's accusations are baseless and reveal fundamental misunderstandings of the listing process.

1.    *The Service Reasonably Applied its Listing Priority Guidelines.*

In recognition that the Service has no control over the workload created by citizen

petitions, Congress drafted the ESA to allow for a "warranted-but-precluded" finding if a species warrants listing but such listing is precluded by higher-priority listing actions. See 16 U.S.C. § 1533(b)(3)(B). Congress has also directed the Service to "utilize a scientifically based priority system to list and delist species, subspecies and populations based on the degree of threat, and proceed in an efficient and timely manner." H.R. Conf. Rep. No. 97-835, *3, reprinted in 1982 U.S.C.C.A.N. at 2862; see also 16 U.S.C. § 1533(h)(3).

The system that the Service adopted in response to this mandate ranks candidate species according to: (1) the magnitude of threats they face; (2) the immediacy of those threats; and (3) the taxonomic distinctiveness of the entity that may be listed. Listing priority numbers range from 1 (highest priority) to 12 (lowest priority).[18] See 48 Fed. Reg. 43,098, 43,102-03 (Sept. 21, 1983). The guidelines are meant to prioritize listing actions "in order to make the most appropriate use of the limited resources available to implement" the ESA. Id. at 43,098. The "magnitude" of the threats is evaluated to ensure that species "facing the greatest threats to their continued existence would receive the highest priority." Id. at 43,103. The "immediacy" of the threats refers not to the imminence of extinction, but rather addresses whether or not the threats are "actual" and "identifiable," as opposed to "only "potential" or not known to be presently affecting the species. Id. at 43,103. The intent of the "taxonomic distinctiveness" criterion is to "devote resources on a priority basis to these species representing highly distinctive or isolated gene pools." Id. The following table shows how the Service uses these three criteria to assign LPN numbers under the Listing Priority Guidelines (see 48 Fed. Reg. 43,103):

---

[18] When multiple species have the same LPN, the Service further prioritizes them according to additional indicia of imperilment. See 75 Fed. Reg. at 14,008.

| Threat | | Taxonomy | Priority |
|---|---|---|---|
| Magnitude | Immediacy | | |
| **High** | Imminent | Monotypic genus | 1 |
| | | Species | 2 |
| | | Subspecies | 3 |
| | Non-imminent | Monotypic genus | 4 |
| | | Species | 5 |
| | | Subspecies | 6 |
| **Moderate to low** | Imminent | Monotypic genus | 7 |
| | | Species | 8 |
| | | Subspecies | 9 |
| | Non-imminent | Monotypic genus | 10 |
| | | Species | 11 |
| | | Subspecies | 12 |

The Service properly assigned an LPN of 8 to the sage-grouse, based on "imminent" threats of "moderate" magnitude to a full species. Based on "high" and "imminent" threats, the Bi-State DPS received an LPN of 3, the highest possible for a population that is not a full species.

WWP argues that political manipulation is evident because scientists carrying out the sage-grouse status assessment used language such as "high level of threats" or "high threats," but then later the Service determined that the species faces "moderate" threats for purposes of assigning an LPN. See, e.g., Pl.'s Mem. at 16-22, 35. WWP misses, or ignores, the fact that a determination of whether listing is "warranted," on the one hand, and a threat assessment under the Listing Priority Guidelines, on the other, are very different determinations that serve very different purposes. Under the ESA, a "warranted" determination is the conclusion that the species is currently in danger of extinction or likely to become endangered in the foreseeable future, based on the five ESA statutory listing factors. See 16 U.S.C. § 1533(a)(1). In contrast, the LPN threat assessment addresses the degree of imperilment under the Listing Priority

Guidelines, for purposes of determining the priority a "warranted" candidate species will receive in relation to other imperiled candidate species. There is no inconsistency between finding that a species like the sage-grouse warrants listing based on serious or "high" levels of threat, but then finding that it faces "moderate" threats relative to other imperiled candidate species. It is somewhat like finding that a person who stands six-feet-seven inches tall is an extremely tall person, but that he is an NBA basketball player of "average" height. There is no inconsistency because there are two different frames of reference.

Many of the species on the Service's candidate list are at very high extinction risk due to very small, narrow populations or very severe, immediate danger of extinction. See 75 Fed. Reg. 14,008; 3959 AR 040586-91. The sage-grouse, in contrast, is widely distributed in 11 states, with a range that includes two large strongholds of contiguous habitat with high population densities. 75 Fed. Reg. at 14,008. The threats to the sage-grouse were also considered to be "moderate" for the LPN assessment because the threats "do not occur everywhere across the range of the species at this time, and where they are occurring, they are not of uniform intensity or such magnitude that the species requires listing immediately to ensure its continued existence." Id. at 14,008.[19]

In order to heighten an alleged "disconnect" between the "warranted" and "precluded" portions of the finding, WWP frequently quotes excerpts of scientific debate out of context to obscure the fact that the scientists, although they viewed the sage-grouse as facing serious threats, did not actually think extinction was likely in the foreseeable future, which was measured in decades. See 75 Fed. Reg. at 13,962, 78, 85 (placing the "foreseeable future" for

---

[19] The "warranted" portion of the 12-Month Finding, which Plaintiff lauds as scientifically sound, see Pl.'s Mem. at 11, similarly notes that threats "are not at a level that is causing a threat to greater sage-grouse everywhere within its range." See 75 Fed. Reg. at 13,962.

various threats to sage-grouse in the range of from 30 to 100 years into the future). For example, WWP claims the Field Management Team asked the Science Team to explain "why the Science Team did not think that sage grouse would persist over time in these two strongholds." Pl.'s Mem. at 17 (citing 4359 AR 043355). What the Field Management Team actually asked the Science Team was "why they saw *reduced persistence* of these 2 areas over time." 4359 AR 043355. In WWP's version, the sage-grouse Science Team informed the Field Management Team that the two sage-grouse "strongholds" were "highly threatened and not likely to persist in the foreseeable future without further protections." Pl.'s Mem. at 6 (citing 5250 AR 060440-444). What WWP does not mention is that the Science Team agreed that the species was not likely to become extinct in the next 50 years. See, e.g., 4359 AR 043356-58. While highlighting the threats that exist to the sage-grouse even in its "strongholds" of contiguous habitat, WWP does not mention that these strongholds were, over all, considered to be "areas of occupied range where the risk of extirpation appears low." 3901 AR 039428; see also 4359 AR 043354 (map depicting "rangewide outlook in 50 years," and showing large areas in which the sage-grouse faced a "low threat level.") Scientists preparing the 12-Month Finding evaluated in detail the magnitude of threats on a region-by-region basis, and in many areas quantified the threats as moderate or low. 3975 041319, 3976 AR 041320-332, and 3973 AR 041306-17.

Contrary to WWP's assertion, the sage-grouse also does not resemble the bull trout discussed in Friends of the Wild Swan, 945 F. Supp. 1388. See Pl.'s Mem. at 31. In that case, a district court remanded the Service's finding of "moderate" threat levels to the bull trout under the Listing Priority Guidelines, because in making that determination, the Service appeared to entirely disregard evidence showing that the bull trout's range consisted "largely and increasingly of isolated subpopulations." Friends of the Wild Swan, 945 F. Supp. at 1397. In

contrast, there is no evidence that the assessment of threats for the sage-grouse LPN disregarded any evidence—rather, it simply reached a rational conclusion about the degree of threat based on the species' current numbers, large range, strongholds of contiguous habitat, and the scientists' view that the species would likely continue to survive for decades to come.

The evaluation of whether the magnitude of threats faced by the sage-grouse should be classified, relative to other imperiled species that warrant listing, as "high" or "moderate," is a paradigmatic example of a technical, scientific determination to which the courts should be extremely deferential. See Marsh v. Oregon Natural Res. Council, 490 U.S. 360, 378 (1989). The Court should defer to the Service's reasonable assessment of this technical issue.

> ## 2. *There is No Evidence of Political Manipulation.*

In its specifics, WWP's narrative of political manipulation is so rife with factual inaccuracies and distortions that space allows rebuttal of only a few representative examples. This explanation requires some background on how the sage-grouse status review was organized. The sage-grouse occupies 11 western states spanning three of the Service's Regions (Regions 1, 6, and 8). The Service set up a cross-regional structure to complete the status review and drafting of the 12-Month Finding. See 4387 AR 043441-42, 106 AR 000244-45. The structure consisted of four cross-regional teams: a biological Science Team; a Field Management Team, consisting of supervisors from several field offices; a Regional Leadership Team, staffed by the three Assistant Regional Directors for Ecological Services; and a Legal Team staffed by Department of the Interior attorneys from each region. See 106 AR 000244, 4387 AR 043441.

In general, the Science Team, chaired by lead biologist Pat Deibert of the Service's Wyoming Ecological Services Office, was responsible for day-to-day technical work on the status review that would inform the 12-month finding. 4387 AR at 043441; 106 AR at 000244;

3930 AR at 040338. The Field Management Team, chaired by Wyoming Ecological Services Field Supervisor Brian Kelly, was responsible for (1) ensuring that the Science Team completed the status review, (2) preparing the draft 12-Month Finding, (3) relaying recommendations to the Regional Leadership Team, and (4) serving as a liaison between the teams. See 106 AR 000244-000245; 4387 AR 043441; 4357 AR 043350; 106 AR 000244.

One basic inaccuracy in WWP's story is the assertion that "final decision-making authority at all times rested with the Region 6 Regional Director," Steve Guertin. Pl.'s Mem. at 5. In fact, that authority was held by the Director of the Fish and Wildlife Service. See 59 AR 000141. Nor, as Plaintiff asserts, is Steve Guertin "politically appointed," Pl.'s Mem. at 29, but is actually a career civil servant. In WWP's story, Region 6 Regional Director Guertin (misidentified by WWP as the sage-grouse "czar")[20] "rejected" and "countermanded" the recommendations of the scientists when he recommended a warranted-but-precluded finding to the Service's Director on November 5, 2009. Pl.'s Mem. at 8-9. Of course, a "warranted but precluded" finding is not a rejection or countermand of a "warranted" determination, but is simply a statutorily-authorized and predictable outcome of the scientists' determination that listing was "warranted." See 16 U.S.C. § 1533(b)(3)(B). Furthermore, the November 5, 2009 memorandum was only a recommendation to the Director, not a final decision, and stated that it was based upon a "preliminary analysis." See 59 AR 001141.

In any event, this memorandum was initially drafted and circulated by Wyoming Ecological Services Field Supervisor Brian Kelly, the chair of the Field Management Team (i.e., the leader of the very scientists allegedly "countermanded"). See 5240 AR 060117 (Kelly email

---

[20] In reality, the term "czar" was a nickname given to Jay Slack, who was at that time Region 6 Deputy Regional Director, referring to his role as liason between the regional teams and Washington, D.C. See AR 43443, 63226. Nor did Slack's nickname mean he possessed "final

circulating draft with a note that he would forward the recommendation memo to his Regional Office once the Field Management Team "OK'd" it); 83 AR 000190 (Kelly email forwarding draft of memo to Assistant Regional Director Michael Thabault); 84 AR 000191-192 (copy of the draft memo attached to Kelly's November 5, 2009 email). In passing this draft recommendation memo up to the Regional Director, Kelly noted that it was "all good with the [Field Management Team]." 83 AR 000190. There was no "countermand."

WWP also wrongly claims that prior to the November 5, 2009 memorandum there is "nothing in the record up to that point indicating how the preclusion status of the sage grouse was arrived at," and that this "gaping hole" evidences *post hoc* political manipulation of the science. See Pl.'s Mem. at 34. However, the record shows that as of November 6, 2009, Pat Deibert, the lead biologist on the Science Team, was already drafting the 12-Month Finding and would have a draft completed that day. See 5217 AR 059917. Draft versions of the finding dated November 6 already contained a preliminary "Preclusion and Expeditious Progress" section. See, e.g. , 5212 AR 59605, 59888-895; see also See 5772 AR 065811 (Field Management Team Chair Kelly email stating that LPN 8 determination was "crafted by" Science Team leader Pat Deibert and Solicitor's Office attorney Margot Zallen).

Nor is there any evidence that the outcome of the 12-Month Finding was predetermined. WWP cites a December 2008 memorandum in which the Director of the Service stated that the regional directors expected the "that the threats to sage grouse would not likely rise to a level to support a positive petition finding." See Pl.'s Mem. at 24 (quoting 2591 AR 014335). WWP claims that this memorandum shows the Director had "a particular outcome in mind nearly a full year before the Science Team had actually had a chance to do its job." Pl.'s Mem. at 25. This is

decision-making authority" for the sage-grouse either.

an odd assertion, since this December 2008 Memorandum shows the Director expected a negative finding, and the eventual outcome, a warranted-but-precluded finding, is what the Service terms a "positive" finding, since it establishes that listing is warranted. See, e.g., 3299 AR 019023 ("On May 7, 2001, we published a positive 12-month finding that determined [listing the Washington population of sage-grouse] was warranted, but precluded by higher priority listing actions."). The 2008 memorandum, if it shows anything, shows that the Director kept an open mind and was later persuaded by the science that the expected negative finding should actually be positive.

By the time of Guertin's November 5, 2009 memorandum, there would have been little question in anyone's mind that a warranted-but-precluded finding was very likely. As already discussed, in the great majority of cases, a 12-month finding that a species warrants listing results in a warranted-but-precluded finding. See supra at 23-25. At the time of the supposedly incriminating November 5, 2009 Guertin memorandum, the Service had already prepared a draft of its FY 2010 budget estimating the amount of funding that would be available to fund listing of high-priority species that were not subject to court orders, court-approved settlements or statutory deadlines. See 3966 AR 040835 (cover email); 3967 AR 040842 (June 30, 2009 draft of FY 2010 Listing Allocation Table); 3967 AR 040842. In November 2009, the Service also published its annual Candidate Notice of Review, which details the status and priority of candidate species and the efforts the Service was making to prioritize the most imperiled candidate species for listing. See 74 Fed. Reg. 57,804 (Nov. 9, 2009).

Emblematic of how badly WWP distorts the record is its claim "[a]s late as February 23, 2010, the Science Team was *still* struggling with the mandate from Guertin to support his preclusion determination." Pl.'s Mem. at 33-34 (emphasis in original). To show this, WWP

quotes an email that WWP depicts as a frank statement by a Science Team member of dissatisfaction with an LPN number handed down from above. See id. (citing 1748 AR 009116). However, Nancy Green, the author of this email, was not a member of the Science Team at all, as WWP claims, but rather was the Chief of Candidate Conservation in the Service's headquarters in Arlington, Virginia. See 3937 AR 040452. She was not voicing the concerns of the Science Team and Field Management Team, but rather criticizing their analysis. In response to her criticisms, Brian Kelly, the Chair of the Field Management Team, vigorously defended their scientific analysis. See 3930 AR 040338. If anything, this email exchange illustrates the vigorous debate and weighing of scientific evidence that informed the 12-Month Finding, and the ultimate deference shown to the views of the scientists.[21]

## III.  WWP Has Waived Any Claims Regarding the Bi-State and Columbia Basin DPS's, and Fails to Challenge Any Judicially Reviewable Decision on the Latter.

WWP's Complaint requests that this Court find the Service's warranted-but-precluded determination for the Columbia Basin DPS and Bi-State DPS were arbitrary and capricious. See Pl.'s Compl., Dkt. 8, at 25-29. Given that the Columbia Basin DPS has an LPN of 6, see 75 Fed. Reg. 69,222, 286 (Nov. 10, 2010), a challenge to its warranted-but-precluded status would likely fail for reasons similar to those discussed in this brief. However, the 12-Month Finding under review in fact contains no warranted-but-precluded determination for that DPS, or any judicially reviewable final agency action on the Columbia Basin DPS. See supra at 9-10; see also 5 U.S.C. § 704 (limiting judicial review to "final agency action"); Bennett v. Spear, 520 U.S. 154, 177-78 (1997) (defining final agency action).

Furthermore, because WWP makes no arguments in its brief regarding either the

---

[21] Apart from the evidence discussed above, Plaintiff's argument of a political motive is undercut by the fact that the Service has agreed to a plan to move aggressively toward clearing the entire

Columbia Basin DPS or the Bi-State DPS, any such claims should be considered abandoned and waived. See Mountain States Legal Found. v. Espy, 833 F. Supp. 808, 813 n.5 (D. Idaho 1993) ("In light of the fact that . . . this action is to be resolved by dispositive motion without a trial, the court must assume that the plaintiffs have abandoned this claim, and summary judgment will be entered in favor of the defendants.").

**IV.     The Court Should Decline to Grant An Infeasible Remedy or One That Conflicts With the MDL Agreements.**

While the Court should reject WWP's claims that the 12-Month Finding was arbitrary and capricious, should the Court hold otherwise and consider remedy, the remedy proposed by WWP of ordering the Service to produce a proposed listing rule within 90 days (see Pl.'s Mem. at 40) is infeasible. See Frazer Decl. ¶¶ 22, 30-32; see also First MDL Agreement ¶ 13. This Court should also forebear from ordering any remedy that conflicts with the carefully formulated schedule for addressing the greater sage-grouse and the rest of the many imperiled species on the candidate list that was approved by the MDL Court.[22] See Section I, *supra*.

## CONCLUSION

Because the MDL Agreements resolve the issues in this litigation, this Court should exercise its equitable discretion to grant Defendant and Plaintiff WildEarth Guardians' joint motion to dismiss. If this Court nevertheless decides to reach the merits, this Court should deny WWP's Motion for Summary Judgment, and grant Defendant's Cross-Motion for Summary Judgment, and dismiss WWP's claims with prejudice.

---

candidate list.
[22] Pursuant to 28 U.S.C. § 1404(a), this Court could transfer this case to the District of Columbia to address remedy issues, as this case could have been brought in that district and the convenience of the parties, witnesses, and the court and the interests of justice all favor transferring to address the remedy issue. See Carver v. Knox County, 887 F.2d 1287, 1291-93 (6th Cir. 1989) (approving transfer for remedy to avoid conflict with ongoing class action).

Respectfully submitted this 19th Day of October, 2011.

IGNACIA S. MORENO,
Assistant Attorney General
SETH M. BARSKY, Chief

 /s/ Daniel J. Pollak 
DANIEL J. POLLAK,
Trial Attorney
U.S. Department of Justice
Environment & Natural Resources Division
Wildlife & Marine Resources Section
Ben Franklin Station
P.O. Box 7369
Washington, DC 20044-7369
Phone: (202) 305-0201
Fax: (202) 305-0275
Email: daniel.pollak@usdoj.gov

Attorneys for Federal Defendant


OF COUNSEL:
Kristin Tita
U.S. Department of the Interior
Office of the Regional Solicitor
Denver, Colorado

/s/  Ryan William Sudbury (with permission) 
RYAN WILLIAM SUDBURY
Sudbury Law Office
PO Box 8366
Missoula, MT 59807
406-529-9744
503-405-7224 (fax)
sudburylawoffice@gmail.com

*Attorney for Plaintiff WildEarth Guardians*[23]

---

[23] Plaintiff WildEarth Guardians joins only as to the Joint Motion to Dismiss and the arguments stated in support of said Joint Motion to Dismiss in Section I of the Arguments in the accompanying Memorandum.

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this 19th day of October, 2011, a true and correct copy of

the foregoing was submitted for electronic filing whereby service will be made upon:

| | |
|---|---|
| John Buse<br>jbuse@biologicaldiversity.org | Ryan Sudbury<br>SudburyLawOffice@gmail.com |
| Amy Atwood<br>atwood@biologicaldiversity.org | Natalie Camacho Mendoza<br>Natalie@cmclawgroup.com |
| James S Burling<br>jsb@pacificlegal.org | Regina Elizabeth Hovet<br>regelizh@aol.com |
| Ronaldo Arthur Coulter<br>ron@cmclawgroup.com | Brandon Murray Middleton<br>bmm@pacificlegal.org |
| James Kaste<br>james.kaste@wyo.gov | William Gerry Myers, III<br>wmyers@hollandhart.com |
| Thomas A Mitchell<br>tommitchel@utah.gov | Bruce M Smith<br>bms@msbtlaw.com |
| Nathan M Olsen<br>nathan@beardstclair.com | Thomas J Woodbury<br>tom@westernwatersheds.org |
| Paul A Turcke<br>pat@msbtlaw.com | |

_/s/ Daniel Pollak_____
DANIEL POLLAK, Trial Attorney