IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| WESTERN WATERSHEDS PROJECT, CENTER FOR BIOLOGICAL DIVERSITY, and WILDEARTH GUARDIANS, | Case No. 4:10-CV-229-BLW |
| Plaintiffs, | **MEMORANDUM DECISION** |
| v. | |
| UNITED STATES FISH AND WILDLIFE SERVICE | |
| Defendant. | |

**INTRODUCTION**

The Court has before it (1) cross-motions for summary judgment filed by WWP, the Fish and Wildlife Service (FWS) and the intervenors, and (2) a joint motion to dismiss on prudential mootness grounds filed by the FWS and plaintiff Guardians. The Court held oral argument on December 21, 2011, and took the motions under advisement. For the reasons expressed below, the Court will (1) grant the motions for summary judgment filed by the FWS and intervenors, (2) deny the joint motion to dismiss on prudential mootness grounds filed by the FWS and plaintiff Guardians, and (3) deny the motion for summary judgment filed by WWP.

**SUMMARY**

The sage grouse is being squeezed. Its western range is consumed by wildfires; its eastern range is trampled by oil and gas drilling. The resulting fragmented habitat isolates and weakens populations, causing a dramatic decline in the species.

Alarmed by these trends, the Fish and Wildlife Service (FWS) decided that listing of the sage grouse was warranted under the Endangered Species Act. At the same time, however, the FWS declined to begin drafting rules to protect the birds because the agency has a limited budget and many other species were in worse condition.

This toothless finding – declaring that the sage grouse deserves protection but doing nothing about it – is known as a "warranted-but-precluded" finding. Critics claim that the agency has used this category as a dumping ground for politically-charged species, calling it "an ER waiting room strewn with the corpses of those species who were forced to wait too long." Kalyani Robbins, *Strength in Numbers: Setting Quantitative Criteria for Listing Species Under the Endangered Species Act*, 27 UCLA J. Envtl. L. & Pol'y 1 (2009).

Indeed, the backlog at the agency was challenged by environmental groups. Some of those groups reached a settlement with the FWS, committing the agency to a timetable to reduce the backlog. Specifically with regard to the sage grouse, the FWS agreed to remove the bird from its "warranted-but-precluded" limbo by 2015.

Plaintiff WWP, however, did not enter into that settlement, and continues to litigate here, seeking a faster resolution for the sage grouse. For reasons explained below,

the Court rejects arguments that WWP is barred from proceeding with this lawsuit because it is somehow bound by a settlement that it did not sign.

WWP asks the Court to reverse the FWS's warranted-but-precluded decision for the sage grouse, and to order the agency to prepare listing rules for the sage grouse within 90 days. WWP is challenging the "precluded" portion of the "warranted-but-precluded" decision, focusing on a key finding by the Director of the FWS that the threats to the sage grouse were merely "moderate" rather than "high". This finding, which WWP alleges was based on politics rather than science, essentially guaranteed that the listing would be "precluded."

Before making this finding, the FWS Director had received a recommendation from FWS Regional Director Steve Guertin that the listing be "warranted-but-precluded." Guertin's recommendation ignored his agency's own guidelines, contained no scientific analysis, and featured off-hand comments about the various political interests at play in the case. Given that political meddling has already resulted in one reversal in this case, the Court was frankly astonished at Guertin's cavalier recommendation.

It was not until after Guertin made his recommendation that the agency's scientists supplied the necessary scientific analysis to the Director. This sequence of events raises a red flag of warning: Did the agency scientists "bend" the science to justify Guertin's recommendation? To answer this question, the Court engaged in an especially thorough review of the record. It contains evidence that (1) sage grouse populations in some areas are stable, (2) substantial habitat exists in many parts of the range, and (3) 96% of all

**Memorandum Decision – page 3**

populations will remain above effective population sizes over the next 30 years. All of this supports the finding of the Director that the threat level is moderate.

However, the record also contains substantial contrary evidence which indicates that the threats to the sage grouse are high and immediate. The science is thus not conclusive on the threat level – it does not lead inevitably to a threat level finding that fits precisely within the bureaucratic designations of "high" or "moderate." Given this, the Director had to exercise his discretion to make a difficult decision. In reviewing that decision, the Court is prohibited by law from substituting its own judgment for that of the Director, but must instead defer to that decision so long as it is not arbitrary or capricious.

The initial recommendation of Regional Director Guertin was clearly arbitrary and capricious, since it was offered before receiving any scientific input. But the subsequent decision of the Director was based on sound science and cured the significant deficiencies of the recommendation. The Court therefore upholds the Director's decision that the threat level to the sage grouse falls into the moderate category.

The Director also had to certify that the FWS is making expeditious progress on its ESA duties in order to place the sage grouse in the warranted-but-precluded category. Congress originally intended that this category be used sparingly and that it not become a bottomless pit where controversial species are dumped and forgotten. There are now over 250 species in this category, and the average time spent there is about 19 years. Species have gone extinct while waiting for listing rules. By no common sense measure of the word "expeditious" has the FWS made expeditious progress in its ESA duties. While the

FWS blames these delays on a lack of funding by Congress, some of the agency's financial woes are self-inflicted. In the past, the FWS's parent agency – the Interior Department – has refused to seek sufficient funds from Congress and has actively sought caps on ESA spending.

Nevertheless, as discussed above, the FWS has recently committed to reducing the backlog, and has made specific commitments regarding the sage grouse. These commitments are the only reason the Court will uphold the agency's certification that it is making expeditious progress. If those commitments prove unreliable, the Court will quickly revisit its findings here upon prompting from any party.

Despite troubling aspects of the FWS decision process, the Court ultimately finds that the Director's decision to place the sage grouse in the warranted-but-precluded category is not arbitrary or capricious.

## LITIGATION BACKGROUND

Between 2002 and 2003, the Fish and Wildlife Service (FWS) received three petitions to list the greater sage-grouse (Centrocercus Urophasianus) as an endangered species under the Endangered Species Act (ESA). Sage grouse populations have declined dramatically as their habitat disappears. They are sagebrush obligates, and rely on sagebrush all year to provide roosting, cover and food. *See* 75 Fed.Reg. 13923. They need large expanses of this sagebrush habitat to survive. *Id*. at 13927. Yet, almost half of the sagebrush habitat estimated to have been present historically has been destroyed, *id.* at 13986, and much of the remaining habitat has been badly fragmented. *Id*. at 13927.

On April 21, 2004, the FWS acted on the petitions for listing by filing its 90-day finding, concluding that the petitions present "substantial information indicating that listing the greater sage-grouse may be warranted." *See* 69 Fed.Reg. at 21484-94. In making that finding, the FWS relied on the declining population throughout the western United States, the extensive habitat destruction, and the lack of regulatory mechanisms to protect the sage grouse. *Id*.

After further study, the FWS issued a decision on January 6, 2005, deciding not to list the sage grouse under the ESA. Following a challenge by WWP, this Court held that the FWS failed to rely on the best science and was influenced by a political appointee who intimidated the scientists in an attempt to block listing. *See WWP v. U.S. Fish and Wildlife Service*, 535 F.Supp.2d 1173 (D. Id. 2007). The agency failed to keep records of the deliberations of the expert panel with the most extensive knowledge of the sage-grouse and its habitat, thereby failing to adequately preserve for the record the "best science." *Id* at 1183-84. The FWS compounded that error by excluding the panel from the final listing decision, such that "[r]ight at the moment where the 'best science' was most needed, it was locked out of the room." *Id.* at 1185. The Court also found that the FWS failed to coherently consider the adequacy of existing regulatory mechanisms. *Id.* at 1187. Finally, the Court found "political meddling," documented in a report issued by the Office of Inspector General, by a Deputy Assistant Secretary, who improperly altered the scientific record to "steer the 'best science' to a pre-ordained outcome." *Id.* at 1188. The Court remanded the matter to the FWS to reconsider its decision in light of the Court's

findings.

**Agency Response to Court Remand**

In responding to the Court's remand, the FWS set up a cross-regional team consisting of (1) a biological Science Team; (2) a Field Management Team made up of supervisors from several field offices; (3) a Regional Leadership Team, staffed by the three Assistant Regional Directors for Ecological Services; and (4) a Legal Team staffed by Department of the Interior attorneys from each region. *See* 106 AR 000244, 4387 AR 043441.

The Science Team, consisting of eight senior level biologists and chaired by the FWS's lead sage grouse biologist, was responsible for completing a status review of the sage grouse based on the best science. *See* 4384 AR 43434. The Field Management Team (FMT), chaired by Wyoming Ecological Services Field Supervisor Brian Kelly, was responsible for (1) ensuring that the Science Team completed the status review, (2) preparing the draft 12-Month Finding, (3) relaying recommendations to the Regional Leadership Team, and (4) serving as a liaison between the teams. *See* 106 AR 000244-000245; 4387 AR 043441. Finally, the Regional Management Team (RMT) acted as regional level leadership, charged with receiving a final listing recommendation from the FMT. *Id.* at 241-42. The leader of the RMT was Region 6 Regional Director Steve Guertin.

This system was devised to avoid the political intimidation that infected the earlier finding that listing was not warranted. The management of the status review by the FMT

would occur at the "field level" to "eliminate[] even [the] perception of DOI influence." *Id.* at 43632.

## Science Team Findings

By September of 2009, the Science Team had compiled enough information to make a recommendation to the FMT that a listing for the sage grouse was warranted. The Science Team based that recommendation on a combination of threats facing the sage grouse. Energy development, invasive plants, increased wildfires, agriculture, urbanization, and infrastructure development had already eliminated almost half of the species' historical habitat, and much of the remainder was becoming fragmented. The Science Team found that habitat loss and fragmentation were likely to increase due to climate change, and available techniques for restoring sagebrush habitat were "limited and generally ineffective."

The Science Team found that the sage-grouse has two strongholds of large areas of contiguous habitat in the southwest Wyoming Basin and the Great Basin area straddling Oregon, Nevada and Idaho. Their findings on these two stronghold areas become important in the review of this matter and so warrant an extended discussion.

The Science Team found that these two stronghold areas "are the largest remaining contiguous areas of sagebrush habitat and are essential for long-term persistence of the landscape scale species." *See* 5250 AR 60443-44. The Team noted that while both areas currently "have large expanses of sagebrush," both are also "experiencing threats that are landscape scale in magnitude and that will increase in the foreseeable future." *Id.*

**Memorandum Decision – page 8**

The principal threat in the Wyoming basin stronghold area is from energy development. The roads and other infrastructure that accompany oil and gas drilling, and uranium mining, cause habitat fragmentation. Although the sage grouse populations in this stronghold area are "currently functioning," the "trajectory [is] towards extirpation sometime in the future." *See* 4359 AR 43357, 43359.

While the primary threats in the Great Basin stronghold area were different – wildfire and invasive weeds – their effect was the same, in that they caused habitat fragmentation. While there are currently "lots of birds," the Science Team was in "[a]greement that it will be swiss cheese in 50 years." *Id.* By the term "swiss cheese," the Science Team meant that the habitat would be subjected to a "high level" of threats "with pockets of extirpation." *See* 4349 AR 43357, 43359.

The Science Team found that if these current trends in the two stronghold areas continue, "sage grouse persistence is questionable . . . ." *See* 5250 AR 60443-44. The Science Team was not optimistic about reversing those trends; it labeled regulatory efforts as "limited" and "ineffective." *Id.* In making its recommendation to the FMT, the Science Team reached the following conclusion:

> It is unlikely that these two strongholds will provide the necessary landscape components necessary to sustain robust populations of greater sage grouse into the foreseeable future without extensive intervention management. While sage grouse are likely to continue to persist in isolated areas of remaining habitats, population connectivity will be limited, and the species will be highly vulnerable to anthropogenic stressors and stochastic events.

## Field Management Team (FMT) Recommendation

On the basis of the Science Team's findings, the FMT recommended to the RMT a finding that the listing of the sage grouse was warranted. This recommendation was based on the Science Team's conclusion, adopted by the FMT, that they expected "only remnant, isolated and dysfunctional populations of greater sage grouse across its eleven state range in the foreseeable future." *Id*. The FMT noted that "[s]ince 2005, the 19 threats identified by the [Science Team] continue to impact the species, with many of the threats intensifying and spreading." *See* 88 AR 197. Since 2005, "new threats have presented themselves" while at the same time "no threat has been eliminated or reduced." *Id.* The FMT summarized its analysis as follows:

> The primary threat to greater sage grouse is fragmentation. Large expanses of intact sagebrush habitat are necessary to maintain viable sage grouse populations. Only two areas in the 11 state range currently provide such expanses and both are already heavily fragmented and are projected to experience additional significant fragmentation in the foreseeable future. Dramatic population declines and local extirpations have already occurred and future fragmentation and habitat degradation is expected to result in remnant, isolated, and dysfunctional populations of greater sage grouse that are in danger of extinction in the foreseeable future. Thus, the FMT recommends that greater sage grouse warrant listing range-wide.

## Regional Director Guertin's Recommendation

Three weeks later, on November 5, 2009, Regional Director Guertin, the leader of the RMT, announced that the RMT would recommend that listing of the sage grouse is warranted. *See* 59 AR 141-42. But he also added that listing should be precluded. *Id.* This was the first mention of preclusion, as the Science Team and the FMT had merely recommended that listing be warranted and said nothing about preclusion.

Guertin's recommendation contains no explanation or analysis of his preclusion recommendation. He does pass along the FMT's paragraph summarizing the status of the sage grouse – quoted above – and also added a section entitled "Position of Interested Parties" that stated as follows:

> Current litigants and petitioners will respond positively to a warranted finding. They are, however, likely to object to the species being precluded and becoming a candidate. In contrast energy developers and livestock interests will oppose a warranted finding but will see candidate status as positive when compared to formally listing the species.

*Id*. at 142.

### Decision of FWS Director

The Director of the FWS accepted this recommendation on March 23, 2010. *See* 75 Fed.Reg. at 13,910-14,014.[1] The Director found that "listing the greater sage-grouse (rangewide) is warranted, but precluded by higher priority listing actions. We will develop a proposed rule to list the greater sage-grouse as our priorities allow." *Id*. at 13,910.

The Director's Findings parallel the Science Team's conclusions. The Findings recognize that the greater sage-grouse requires "large, interconnected expanses of sagebrush with healthy, native understories." *Id*. at 13917. Maintaining a contiguous sagebrush habitat is "essential for sage-grouse persistence." *Id*. at 13923. Yet, almost

---

[1] The decision also found that (1) listing was not warranted for the western subspecies of the greater sage-grouse and (2) listing was warranted but precluded for the Bi-State population, a distinct population segment of the greater sage-grouse. Neither finding is at issue here.

half of the sagebrush habitat estimated to have been present historically has been destroyed. *Id.* at 13986. Causes include "direct conversion, urbanization, infrastructure such as roads and powerlines built in support of several activities, wildfire and the change in wildfire frequency, incursion of invasive plants, grazing, and nonrenewable and renewable energy development." *Id.* at 13924. Many of these threat factors are exacerbated by the effects of climate change, which may influence long-term habitat trends. *Id.*

The resulting fragmentation of sagebrush habitat is the "primary cause of the decline of sage-grouse populations because the species requires large expanses of contiguous sagebrush." *Id.* at 13927. Reversal of this trend is difficult because the "processes to restore sagebrush ecology are relatively unknown." *Id.* at 13917. The most widespread varieties of sagebrush can take up to 150 years to reestablish themselves. *Id.* at 13932.

While fragmentation of habitat is occurring range-wide, its causes differ by region. Fire and invasive plants – and the interaction between them – "is more pervasive in the western part of the range than in the eastern." *Id.* at 13962. In the eastern range, it is oil and gas development that has the highest impact on habitat. *Id.*

The western range is plagued by invasive weeds that die in the summer and provide fuel for wildfires that destroy large swaths of sagebrush. The Findings predict that climate change will make this region hotter and drier, and that these wildfires will become larger and more severe. *Id.* at 13955-56.

The oil and gas development threatening the sage grouse's eastern range has negative impacts on lek persistence, lek attendance, winter habitat use, recruitment, yearling annual survival rate, and female nest site choice. *Id*. at 13927-28. For example, "12 years of coal-bed methane gas development in the Powder River Basin of Wyoming has coincided with 79 percent decline in the sage-grouse population." *Id*. at 13942. Across the entire range, "the projected increase in oil and gas energy development within the sage-grouse range "could reduce the population by 7 to 19 percent from today's numbers." *Id.* at 13947.

The figure for "today's numbers" is not clear. There is no generally agreed-upon current population number, and past estimates differ substantially. For example, one leading expert estimated that in 1998, the rangewide spring population numbered 157,000. *Id.* at 13921. But that same year, state wildlife agencies estimated the population was 515,000. *Id.* In 2003, another expert concluded that the 1998 estimate of 157,000 was too low, but he was unable to generate a more precise estimate. Id.

While reliable population numbers are hard to come by, the Findings addressed trends showing a "dramatic" decline from 1965 to 1985, and then a slowing decline from 1986 to 2007. *Id*. at 13922. While noting this slowing rate of decline, the Findings concluded "low population sizes and relative lack of any sign of recovery across numerous populations is troubling." *Id*. at 13987. The range of the sage grouse "is now characterized by numerous relatively small populations existing in a patchy mosaic of increasingly fragmented habitat, with diminished connectivity." *Id*. at 13988. These

small and isolated populations have a higher risk of extinction due to a random event. *Id.*

The Findings did note that "habitat still remains to support the species in many areas of its range, such as higher elevation sagebrush and areas with a low human footprint . . . ." *Id.* at 13962. In addition, the Findings recognized that "two strongholds of contiguous sagebrush habitat [Wyoming Basin and the Great Basin] . . . contain the highest densities of males in the range of the species . . .[and] the ability of these strongholds to maintain high densities to date in the presence of several threats indicates that there are sufficient habitats currently to support the greater sage-grouse in these areas . . . ." *Id.* However, even these two stronghold areas are "being impacted by direct habitat loss and fragmentation that will continue for the foreseeable future. *Id.* at 13988.

The Findings paint a gloomy picture of future population trends by citing a leading scientific analysis that predicts declines in all regions. *Id.* at 13959. For example, the population in Management Zone II, which includes the Wyoming Basin, is predicted to decline by 66% between 2007 and 2037, if current trends continue. *Id.* As another example, the population in Management Zone IV, which includes the Snake River Plain area, is predicted to decline by 55% in those same years. *Id.*

A large swath – 51% – of critical habitat is administered by the BLM, *id.* at 13975, but its management "falls short of meeting the conservation needs of the species." *Id.* at 13979. This was "particularly evident in the regulation of oil, gas, and other energy development activities . . . . Stipulations commonly applied by BLM to oil and gas leases and permits do not adequately address the scope of negative influences of development

on sage-grouse." *Id*. at 13979.

On the basis of this analysis, the Findings concluded that listing of the sage grouse was warranted. However, after reviewing its funding, and comparing the magnitude and immediacy of the threats to the sage grouse with threats to other listed species, the Director decided that listing would be "precluded by higher priority listing actions." *Id*. at 13910.

As part of that review, the Director assigned to the sage grouse a Listing Priority Number (LPN) based on the magnitude of the threats and their imminence – the possible LPN ratings ranged from 1 to 12, ascending as the threat level decreases. The Director assigned the greater sage-grouse an LPN of 8 "based on our finding that the species faces threats that are of moderate magnitude and are imminent." *Id*. at 14008. The Director found that "[t]hese threats include the present or threatened destruction, modification, or curtailment of its habitat, and the inadequacy of existing regulatory mechanisms to address such threats." *Id.* The Director explained his finding that the threats were "moderate," rather than "high," as follows:

> We consider the threats that the greater sage-grouse faces to be moderate in magnitude because the threats do not occur everywhere across the range of the species at this time, and where they are occurring, they are not of uniform intensity or of such magnitude that the species requires listing immediately to ensure its continued existence. Although many of the factors we analyzed (e.g, disease, fire, urbanization, invasive species) are present throughout the range, they are not to the level that they are causing a significant threat to greater sage-grouse in some areas. Other threats are of high magnitude in some areas but are of low magnitude or nonexistent in other areas such that overall across the species' range, they are of moderate magnitude. Examples of this include: oil and gas development, which is extensive in the eastern part of the range but

limited in the western portion; pinyon-juniper encroachment, which is substantial in some parts of the west but is of less concern in Wyoming and Montana; and agricultural development which is extensive in the Columbia Basin, Snake River Plain, and eastern Montana, but more limited elsewhere. While sage-grouse habitat has been lost or altered in many portions of the species' range, substantial habitat still remains to support the species in many areas of its range (Connelly et al. in press c, p. 23), such as higher elevation sagebrush, and areas with a low human footprint (activities sustaining human development) such as the Northern and Southern Great Basin (Leu and Hanser in press, p. 14) indicating that threats currently are not high in these areas. The species has a wide distribution across 11 western states. In addition, two strongholds of contiguous sagebrush habitat (the southwest Wyoming Basin and the Great Basin area straddling the States of Oregon, Nevada, and Idaho) contain the highest densities of males in the range of the species (Wisdom et al. in press, pp. 24-25; Knick and Hanser (in press, p. 17). We believe that the ability of these strongholds to maintain high densities in the presence of several threat factors is an indication that the magnitude of threats is moderate overall.

*Id*. at 14008-09.

With the magnitude of the threat being only moderate, the sage grouse was tagged with an LPN of 8. Given that over 100 species had LPN's of 2, the sage grouse fell well back in the priority line. Moreover, the Director explained, the agency does not have the funding to simultaneously produce recovery plans for each candidate species. For all of these reasons, the Director concluded that while the listing of the sage grouse was warranted, it would be precluded at this time.

## MDL Cases

Environmental groups challenged the Director's decision – and the general backlog of pending listing decisions – in lawsuits that were consolidated in Multi-District Litigation (MDL) before Judge Emmet G. Sullivan in the U.S. District Court for the

District of Columbia.  The plaintiffs in the MDL litigation included the same three plaintiffs that filed this case:  (1) WWP; (2) Center for Biological Diversity, and (3) Wildearth Guardians.

In the MDL case, Guardians and the Center have entered into separate settlement agreements with the FWS, and Judge Sullivan approved these Settlement Agreements on September 9, 2011.  *In re Endangered Species Act Section 4 Deadline Litig.*, Misc. Action No. 10-377 (EGS), MDL Docket No. 2165 (D.D.C.)("ESA Section 4 MDL"), MDL Docket ("Dkt.") 55 and 56.12.  Together, these Settlement Agreements provide for the FWS to complete a proposed listing rule or not-warranted finding for the sage-grouse by the end of fiscal year 2015.

Under the six-year term of the First MDL Agreement between the Service and Guardians, subject to certain conditions and limitations, the FWS has agreed to complete initial petition findings for over 600 species and to issue proposed listing rules or not-warranted findings for at least 251 candidate species.  In exchange for the FWS's substantial workload commitment, Guardians agreed not to sue the FWS on allegedly untimely petition findings or to challenge the FWS's progress in listing candidate species during the term of the First MDL Agreement.   Guardians also agreed to move to dismiss this sage-grouse litigation with prejudice.

On July 12, 2011, the FWS and the Center entered into the Second MDL Agreement, which resolves the Center's claims in the MDL litigation.  Pursuant to this Agreement, the Center moved to withdraw from this case and the Court granted that

motion.  *See Order (Dkt. No. 86).*

## Cross-Motions for Summary Judgment

Now before the Court is a motion for summary judgment filed by WWP seeking a ruling that the FWS's warranted-but-precluded finding is arbitrary and capricious.  The FWS and plaintiff Guardians filed a joint motion seeking to dismiss this case on the ground that WWP's challenge should be deemed prudentially moot due to the MDL settlement.  Finally, the FWS seeks summary judgment on the ground that its decision was not arbitrary and capricious, although Guardians does not join in that motion.

## STANDARD OF REVIEW

FWS's actions pursuant to the Endangered Species Act (ESA) are reviewed under the Administrative Procedures Act (APA), 5 U.S.C. § 706(2)(A).  *See Friends of Endangered Species, Inc. v. Jantzen,* 760 F.2d 976, 981–82 (9th Cir.1985).  Under this standard, the reviewing court must set aside the agency's decision if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  "A decision is arbitrary and capricious if the agency 'has relied on factors which Congress had not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.' "  *O'Keeffe's, Inc. v. U.S. Consumer Product Safety Comm'n*, 92 F.3d 940, 942 (9th Cir.1996) (quoting *Motor Vehicle Mfrs. Assn. v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983)).  An

agency action is also arbitrary and capricious if the agency fails to "articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.' " *Motor Vehicle Mfrs. Assn.*, 463 U.S. at 43, 103 S.Ct. at 2866 (citations omitted). Finally, an agency must set forth clearly the grounds on which it acted. *See Atchison T. & S.F. Ry. v. Wichita Bd. of Trade*, 412 U.S. 800, 807 (1973).

"Review under the arbitrary and capricious standard is narrow, and the reviewing court may not substitute its judgment for that of the agency." *O'Keeffe's, Inc.*, 92 F.3d at 942 (citing *Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 376 (1989)). Nevertheless, the reviewing court must undertake a "thorough, probing, in-depth review" of the agency's decision. *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415–16 (1971).

## ANALYSIS

### Prudential Mootness

The FWS argues that the two MDL settlements render this lawsuit prudentially moot. Unlike Article III mootness that addresses the power of the courts to grant relief, the doctrine of prudential mootness concerns the court's discretion in the exercise of that power. *Chamber of Commerce v. Dep't of Energy*, 627 F.2d 289, 291 (D.C.Cir.1980). In some circumstances, a controversy, not actually moot, "is so attenuated that considerations of prudence and comity for coordinate branches of government counsel the court to stay its hand, and to withhold relief it has the power to grant." *Id*. The FWS argues that in the MDL settlements, it essentially agreed to what WWP seeks here, and

the Court should therefore decline to order relief that is already underway.

The Court disagrees for two reasons. First, the relief WWP seeks here was not granted by the MDL settlement agreements. Under those agreements, the FWS has until 2015 to make its listing decision, but in this lawsuit, WWP is asking for much quicker relief. Second, to bar WWP from seeking any relief different than the MDL settlements would be to bind WWP to agreements it never signed, an unjust result: "[O]f course, parties who choose to resolve litigation through settlement may not dispose of the claims of a third party." *Local Number 93 v. City of Cleveland*, 478 U.S. 501, 528 (1986). For these reasons, the Court will decline to apply the doctrine of prudential mootness.

## FWS Findings

The parties very quickly focused on the central issue in this case: Whether the FWS acted arbitrarily in concluding that the threat level to the sage grouse was "moderate." If this threat level was not arbitrarily chosen, the FWS clearly acted reasonably in tagging the sage grouse with an LPN of 8, a key component of the "warranted-but-precluded" finding.

Congress drafted the ESA to allow for a "warranted-but-precluded" finding if a species warrants listing but such listing is precluded by higher-priority listing actions. *See* 16 U.S.C. § 1533(b)(3)(B). The circumstances under which the Secretary may invoke that excuse, however, "are narrowly defined." *Center for Biological Diversity v. Kempthorne*, 466 F.3d 1098, 1102 (9th Cir. 2006). Implementation of the listing must be precluded pending proposals *and* expeditious progress must be being made to list

qualified species and delist those for whom the ESA's protections are no longer necessary. *Id.* (emphasis in original). The FWS must show that it "is actively working on other listings and delistings and must determine and publish a finding that such work has resulted in pending proposals which actually preclude proposing the petitioned action at that time," and "must determine and present evidence that [it] is, in fact, making, expeditious progress in the process of listing and delisting other species." *Id.* (quoting 1982 U.S.C.C.A.N. 2860, 2863).

Congress also requires the FWS to establish, in published agency guidelines, "a ranking system to assist in the identification of species that should receive priority review . . . ." 16 U.S.C. § 1533(g). In response, the FWS drafted Guidelines that describe a system for comparing the candidate species. Basically, the FWS assigns a number (LPN) to each species depending on how seriously it is being threatened. The LPN will determine where in the priority line the species stands, and the agency's resources will then determine how far down the line the agency can go in immediately drafting listing rules – species further down the line must wait and are given a "precluded" designation.

To be more precise, the FWS assigns an LPN to each candidate species according to: (1) the magnitude of threats they face; (2) the immediacy of those threats; and (3) the taxonomic distinctiveness of the entity that may be listed. *See* 48 Fed.Reg. 43098, 43102 (Sept. 21, 1983). An LPN could range from 1 (highest priority) to 12 (lowest priority). *Id.* at 43,098, 43,102-03. The priority listings were designed to "make the most appropriate use of the limited resources available to implement" the ESA. *Id.* at 43,098.

**Memorandum Decision – page 21**

The "magnitude" of the threats is evaluated to ensure that species "facing the greatest threats to their continued existence would receive the highest priority." *Id.* at 43,103. Under the FWS Guidelines, a threat to a species could be deemed high, moderate, or low. *Id.* at 43,104. The high category means "extinction is almost certain in the immediate future because of a rapid population decline or habitat destruction." *Id.* Moderate means "the species will not face extinction if recovery is temporarily held off, although there is continual population decline or threat to its habitat." *Id.* A species in the low category "is rare, or is facing a population decline which may be a short-term, self-correcting fluctuation, or the impacts of threats of the species' habitat are not fully known." *Id.*

The "immediacy" of the threats refers not to the imminence of extinction, but rather addresses whether or not the threats are "actual" and "identifiable," as opposed to "only potential" or not known to be presently affecting the species. *Id.* at 43,103. The intent of the "taxonomic distinctiveness" criterion is to "devote resources on a priority basis to these species representing highly distinctive or isolated gene pools." *Id.*

This review of the FWS Guidelines shows that the agency's LPN designations – that is, the agency's findings on magnitude, imminence, and taxonomy – are supposed to be based entirely on science. For example, a finding that a threat is "moderate" because the "species will not face extinction if recovery is temporarily held off, although there is continual population decline or threat to its habitat" is based on science rather than the availability of agency resources and the dire needs of other species. It is not until after

the LPN is designated that the agency starts making administrative decisions comparing

species and evaluating how many it can help given its resources. Under the FWS's own

Guidelines, setting an LPN is an indispensable first step in the process of making a

warranted-but-precluded finding.

**A Botched Recommendation**

As discussed above, on November 5, 2009, Regional Director Guertin, the leader

of the RMT, recommended a warranted-but-precluded finding to the FWS Director. *See*

59 AR 141-42. Regional Director Guertin's recommendation to the FWS Director

contained no LPN designation. Indeed, the record is clear that the agency had made no

such designation at that point. A draft of the Findings dated November 6, 2009, a day

after Regional Director Guertin's recommendation, contains a generic discussion of the

LPN with question marks substituted for a specific number designation:

> [w]e assigned the greater sage grouse a LPN of ?? based on our finding that the
> species faces threats that are of ? iminency [sic] and of ? magnitude, including
> the present or threatened destruction, modification or curtailment of its habitat;
> and the inadequacy of existing regulatory mechanisms. We consider the threat
> magnitude [the rest of the sentence consists of ". . . . . ."].

*See* 5212 AR 59893. Indeed, twelve days after the date of this draft, the FMT Leader,

Brian Kelly states in an e-mail to Pat Deibert of the Science Team that "[m]y guess is we

take our shot at what LPN we think this critter is." *See* 3958 AR 40573. It was not until

later in November or December of 2009 – weeks after Regional Director Guertin's

recommendation and a few months before the Director's final decision – that the Science

Team and the FMT set the LPN at 8. *See* 5772 AR 65811.[2]

This record establishes that (1) Regional Director Guertin made his warranted-but-precluded recommendation without an LPN, and (2) the LPN was designated only after Regional Director Guertin had made his warranted-but-precluded recommendation. Under the FWS's own Guidelines, it is impossible to make the required comparisons among species without an LPN, and so Regional Director Guertin's recommendation is meaningless. Indeed, it may have been worse than meaningless, because in lieu of a Guideline analysis, Regional Director Guertin substituted a politically-tinged observation about the "high interest" in the case by the "involved States, the [BLM] . . . the oil and gas industry, wind energy developers, and the livestock industry." *Id*. at 142.

Of course, the Court is reviewing the decision of the FWS Director, not the recommendation of Regional Director Guertin. The decision of the FWS Director was free of political observations and contained an LPN designation. Nevertheless, the sequence of events surrounding the recommendation is troubling because it creates an appearance that the LPN was chosen after-the-fact to justify a decision (or at least a recommendation) already made.

This requires an extra measure of close scrutiny to determine whether the FWS Director based his decision on science or the political musings of Regional Director

---

[2] Even this is not entirely clear. The FWS failed to develop a clear administrative record on the development of the LPN. Nevertheless, piecing together various e-mails discussed above, the Court finds sufficient evidence that the Science Team and the FMT concluded that the LPN should be 8 and eventually drafted the warranted-but-precluded findings that are the subject of this review.

Guertin.  More specifically, the Court must closely evaluate the FWS Director's decision

that the LPN should be 8 based on a finding that the threat level was "moderate."

**Review of the "Moderate" Threat Level Decision**

In making that "moderate" finding, the FWS Director cited two reasons:  (1) "the

threats do not occur everywhere across the range of the species at this time," and (2)

"where they are occurring, they are not of uniform intensity or of such magnitude that the

species requires listing immediately to ensure its continued existence."

To support the first reason, the Director points out that while a threat may be high

in one area – like oil and gas development in the eastern range – that same threat is lower

in other areas so the threats "overall across the species' range, . . .are of moderate

magnitude."  *Id*. at 14008.  If this analysis was meant to imply that there is no threat that

applies across the entire range, it conflicts with the FWS's own findings.  The FWS found

that the primary threat to sage grouse – fragmentation of habitat – applies across the

range.  *Id*. at 13,928 (describing FWS findings that fragmentation is "ubiquitous across

the species' range," and "habitat fragmentation is a primary cause of sage-grouse

decline").

Even so, the Director found that substantial habitat still exists:

> [w]hile sage-grouse habitat has been lost or altered in many portions of the
> species' range, substantial habitat still remains to support the species in many
> areas of its range (Connelly et al. in press c, p. 23), such as higher elevation
> sagebrush, and areas with a low human footprint (activities sustaining human
> development) such as the Northern and Southern Great Basin (Leu and Hanser
> in press, p. 14) indicating that threats currently are not high in these areas.

*Id.* at 14008-09.

This analysis finds support in the record. The Connolly article, cited by the FWS above, was a peer-reviewed article, published less than two years ago, co-authored by 21 of the leading scientific experts on the sage grouse. It concluded that although "[m]uch sage-grouse habitat has been lost or altered, . . . substantial habitat still exists to support this species in many parts of its range." *See* AR 27435. The article also finds that while "many areas" have seen "substantial declines" in population, there are "relatively stable populations in other portions of the species' range." *See* AR 27413. The article concludes that "[t]he continued widespread distribution of sage-grouse, albeit at very low densities in some areas, coupled with large areas of important sagebrush habitat that are relatively unaffected by the human footprint, suggest that Greater Sage-Grouse populations may be able to persist into the future." *Id*. The article also predicts that 96% of all populations will remain above effective population sizes over the next 30 years. *See* AR 27427.

This article supports the Director's conclusion that "substantial habitat still remains to support the species in many areas of its range." That would in turn support his finding that the threat level was "moderate" because "the species will not face extinction if recovery is temporarily held off, although there is continual population decline or threat to its habitat." *See* 48 Fed.Reg. 43104.

Also central to the Director's conclusion was his finding that the two stronghold areas contain the "highest densities of males in the range of the species," a fact that

demonstrates "the ability of these strongholds to maintain high densities in the presence of several threat factors is an indication that the magnitude of threats is moderate overall." *Id*. This conclusion also contains support in the record from the Science Team's conclusion that both strongholds "currently have large expanses of contiguous sagebrush." *See* 5250 AR 60443.

Thus, even under the close scrutiny required by the after-the-fact LPN designation, the decision of the FWS Director that the threat level was moderate has support in the science. The standard on review is not whether the decision is correct; it is instead whether the decision is arbitrary or capricious.

## Contrary Science

The record certainly contains contrary information – indeed, the record is packed with evidence that would have supported a finding that the threat level was high. For example, in the Wyoming Basin stronghold, oil and gas development and uranium mining are causing habitat fragmentation "even when mitigative measures are implemented." *See* 5250 AR 60441. Measures to protect sage grouse in energy development areas "are largely ineffective as they are not based on current science and rarely consider the indirect effects of development." *Id*. at 60442. While these flimsy mitigation measures are the last line of defense, development has surged recently, putting intense pressure on habitats. *See* AR 33452 (oil and gas development in Wyoming Basin has been "likely underestimated" due to recent increase in development). Meanwhile, the sage grouse is "loyal" to its seasonal habitats, and "birds returning to areas disturbed by energy

development no longer reproduce." *See* 5250 AR 60441.

At the same time, habitat in the western stronghold is being destroyed by wildfire. *See* 75 Fed.Reg. 13933-34. This destruction has grown so great that it is "well outside the historic range of variability," and is "likely to prevent full recovery of sagebrush habitats that burn." *See* 5250 AR 60442. The most widespread variety of sagebrush can take 150 years to become reestablished in a burned-over area. *See* 75 Fed.Reg. 13932. But even that time-frame might be unrealistic because the drying of the west by climate change, and the invasion of cheatgrass and other fuels accelerate wildfires and prevent sagebrush from returning. *Id.* at 13955-57.

These ominous trends could be reversed by some combination of extensive regulatory management and the birds' resiliency. But both are suspect. The FWS looked over the regulatory landscape and concluded "[t]he absence of adequate regulatory mechanisms is a significant threat to the species, now and in the foreseeable future." *Id.* at 13982. And the birds have "little ability to adapt to habitat change." *See* AR 27361

**Judicial Evaluation of Agency Decision**

The science is thus not conclusive on the threat level – it does not lead inevitably to a threat level finding that fits precisely within the bureaucratic designations of "high" or "moderate." Given this, the Director had to exercise his discretion to make a difficult decision. In reviewing that decision, the Court is prohibited by law from substituting its own judgment for that of the Director, but must instead defer to that decision so long as it is not arbitrary or capricious. "[S]cientific uncertainty generally calls for deference to

agency expertise." *Greater Yellowstone Coalition, Inc. v. Servheen*, 2011 WL 5840646 (9th Cir. Nov. 22, 2011)(citing *Lands Council v. McNair*, 537 F.3d 981, 993 (9th Cir.2008) (en banc)).

The FWS Guidelines state that a threat is moderate if "the species will not face extinction if recovery is temporarily held off, although there is continual population decline or threat to its habitat." *See* 48 Fed.Reg. 43104. The FWS found that the threat to the sage grouse was moderate because substantial habitat still remains to support the species in many areas of its range. That conclusion finds support among the leading sage grouse experts who concluded that (1) sage grouse populations in some areas are stable, (2) substantial habitat exists in many parts of the range, and (3) 96% of all populations will remain above effective population sizes over the next 30 years. *See* AR 27413, 27427.

While the Court is troubled by the recommendation of Regional Director Guertin, the Court is convinced that the FWS Director ultimately relied on the best science. Hence, the Court cannot find that the FWS decision designating the threat to the sage grouse as moderate is arbitrary or capricious.

**Expeditious Progress**

The Court must also review the FWS's decision that it is proceeding expeditiously. Congress originally intended that this category be used sparingly, and that it not be used to delay acting on politically controversially species. *See* H.R. Rep. No. 97-567 (1982) (Congress never intended "to allow the Secretary to delay commencing the rulemaking

process for any reason other than the existence of pending or imminent proposals to list species subject to a greater degree of threat."). When Congress gave the FWS the authority to make warranted-but-precluded findings, it simultaneously warned courts that they "will, in essence, be called on to separate justifications grounded in the purposes of the Act from the foot-dragging efforts of a delinquent agency." *See* H.Rep No. 835, 97th Cong., 2d Sess., reprinted in 1982 U.S.C.C.A.N. 2860 (Sept. 17, 1982).

According to the FWS, there are currently 251 species in the warranted-but-precluded category. *See U.S. FWS, Species Reports.*[3] The Ninth Circuit has observed that "potentially qualified species may sit on candidate lists for extraordinarily long periods before becoming the subject of protective rules." *Center for Biological Diversity v. Norton*, 254 F.3d 833, 840 (9th Cir. 2001). At the time of the decision under review here, the FWS had "56 candidate species with an LPN of 2 that have not received funding for preparation of proposed listing rules." 75 Fed.Reg. 14008. Just a few months ago, the FWS itself described the backlog as "substantial" in testimony before Congress. *See Endangered Species Act Review, 2011 WLNR 24788888 (Oct. 21, 2011)(congressional testimony of Gary Frazier, Assistant Director, Endangered Species, U.S. FWS).*

One commentator estimates that species spend an average of 19 years waiting in the warranted-but-precluded category. *See* K. Molly Smith, *Abuse of the Warranted But Precluded Designation: A Real or Imagined Purgatory?*, 19 Southeastern Envtl. L. J.

---

[3] Found at: *http://ecos.fws.gov/tess_public/pub/SpeciesReport.do?listingType=C*

119, 131 (2010).  At least 42 species have gone extinct during delays in the listing

process.  D. Noah Greenwald, *The Listing Record*, in *The Endangered Species Act at*

*Thirty* 51 (Dale D. Goble et al. eds., 2006)   Given these delays, the FWS could not be

deemed to be proceeding expeditiously under any measure.

The FWS blames the backlog on Congress and the courts, claiming that it has been

underfunded and that various limits (known as caps) have been placed by Congress on the

amount that it can spend.  *See* 75 Fed.Reg. at 14007 ("Thus, through the listing cap, the

critical habitat subcap, and the amount of funds needed to address court-mandated critical

habitat designations, Congress and the courts have, in effect, determined the amount of

money available for other listing activities.").

But all is not as it seems.  The FWS's financial pinch is not being imposed entirely

from the outside; much of it is coming from inside the agency's own home.  The FWS's

parent agency, the Department of the Interior (DOI), has limited its budget requests and

asked for spending caps on listing activities.  *See Center for Biological Diversity v.*

*Norton*, 163 F.Supp. 2d 1297, 1300 (D.N.M. 2001) (discussing DOI's admission that "the

listing program [budget] is not proposed at a level that would allow the [FWS] to meet all

of the [ESA's] requirements and deadlines"); J. Michael Scott et al.*, By the Numbers, in*

*The Endangered Species Act at Thirty* 16, 31 (Dale D. Goble et al. eds., 2006) (discussing

DOI's request that Congress impose spending caps on its ESA duties).  In each year from

1998 to 2003, the DOI asked Congress to cap spending on listing.  *Id*. at 64.  While the

FWS itself has estimated that $153 million is necessary to address the backlog, the DOI

routinely requests less than $9 million. *Id.*

Obviously, in recent years, the devastating recession has tightened budgets for all agencies. Thus, the Court cannot find that all of the FWS's current funding short-fall stems from a parsimonious parent agency. At the same time, some of it is self-inflicted, making it disingenuous for the FWS to paint itself as a helpless victim of external forces.

Moreover, the FWS may not "evade the law simply by failing to appropriate enough money to comply with it." *Center for Biological Diversity v. Norton*, 304 F.Supp.2d 1174 (D. Ariz. 2003) (rejecting FWS argument that it could not comply with listing duties because it was underfunded). Put another way, "[t]he solution of being over-obligated and under-funded rests with Congress, and not with the Court." *Butte Environmental Council v. White*, 145 F.Supp.2d 1180, 1185 (E.D.Cal.2001).

The FWS responds that it is forbidden to spend money in excess of appropriated funds by the Anti-Deficiency Act, 31 U.S.C. § 1341(a)(1) (1982). That act explicitly prohibits an agency from "mak[ing] or authoriz[ing] an expenditure or obligation exceeding an amount available in an appropriation." *Id.* The FWS does not argue directly that this Act trumps the ESA, but at least one court has rejected that argument in dicta. *See Forest Guardians v. Babbitt*, 174 F.3d 1178 (10th Cir. 1999) ("the Secretary does not press the argument that inadequate [funding] relieved him of ESA duties . . . [but] [w]e could not accept that argument if it had been raised . . ."). Moreover, a court order would be a complete defense to prosecution under the Act. *Clarke v. United States*, 915 F.2d 699, 701 (D.C.Cir.1990). This judicial reading of the Act is confirmed by a ruling of the

Comptroller General of the United States, finding that agency spending ordered by a court "would not be viewed as violating the Anti-Deficiency Act." *See 63 Op. Comp. Gen. 308, \*11 (1984)* (quoted in *Center for Biological Diversity*, 304 F.Supp.2d at 1180).

Nevertheless, as discussed above, the FWS has recently committed to reducing the backlog, and has made specific commitments regarding the sage grouse. These commitments, if carried out, would represent substantial progress on the backlog described above. For that reason – and only for that reason – the Court will uphold the agency's certification that it is making expeditious progress. If those commitments prove unreliable, the Court will quickly revisit its findings here upon prompting from any party.

## Conclusion

For the reasons stated above, the Court will (1) grant the motions for summary judgment filed by the FWS and the intervenors and hold that the FWS warranted-but-precluded decision is not arbitrary and capricious; (2) deny the joint motion to dismiss on prudential mootness grounds filed by the FWS and plaintiff Guardians; and (3) deny the motion for summary judgment filed by WWP. The Court will issue a separate Judgment as required by Rule 58(a).

DATED: **February 2, 2012**

Honorable B. Lynn Winmill
Chief U. S. District Judge